IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| REP MCR REALTY, L.L.C., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 02 C 0399 |
| | ) | |
| | ) | Judge Mark Filip |
| MICHAEL W. LYNCH, | ) | |
| an Illinois Resident, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| MICHAEL W. LYNCH, | ) | |
| an Illinois Resident, | ) | |
| | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SEYFARTH SHAW and EDWARD | ) | |
| KARLIN, an Illinois resident, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, REP MCR Realty, L.L.C. ("REP" or "Plaintiff") has sued Michael Lynch

("Lynch" or "Defendant"), and has alleged that Lynch is liable under a personal guaranty

("Guaranty") that Lynch signed. Almost a year after Lynch was sued, he filed a third-party

complaint against Seyfarth, Shaw, Fairweather, and Geraldson ("Seyfarth Shaw") and Edward J.

Karlin ("Karlin") (collectively, "Third-Party Defendants"), who were attorneys advising Lynch

and/or various entities in which he had substantial interests at the time the Guaranty was signed.

By his third-party suit, Lynch claimed he was entitled to indemnification in the event he were

found to be liable to REP on the Guaranty. (D.E. 62.)

There are three motions pending before this Court. REP has moved for summary judgment against Lynch on the breach-of-guaranty claim. Seyfarth Shaw and Karlin also have moved for summary judgment against Lynch on his third-party indemnification claim. These motions were filed and briefed after Seyfarth Shaw and Karlin moved for dismissal of Lynch's third-party suit against them based on alleged fabrication of three critical documents Lynch produced in the litigation ("Sanctions Motion")—documents that appear to be the strongest, if not, more likely, the only, documentary evidence in support of at least some aspects of Lynch's claims against Seyfarth Shaw and Karlin.

Briefing proceeded on all three motions. During the briefing, REP joined in the Sanctions Motion against Lynch.[1] REP explained that it believed it had a strong case for summary judgment on its suit against Lynch concerning the Guaranty, but REP understandably also wanted an opportunity to argue that it was entitled to the benefit of any sanctions ruling against Lynch. As explained further below in Section III, there are few, if any, material factual disputes concerning REP's summary judgment motion. As one would expect, there are many factual disputes concerning the Sanctions Motion.

On January 20 and 21, 2005, the Court held an evidentiary hearing on the Sanctions Motion that included testimony from several witnesses. Included among the witnesses were Defendant Michael Lynch and Third-Party Defendant Edward Karlin. Based on the evidence presented in connection with the Sanctions Motion, including the live testimony, the Court

---

[1]     The Court at times uses the term "Movants" to refer to Seyfarth Shaw, Karlin, and REP collectively, which all have sought sanctions against Lynch.

cannot help but conclude that Lynch wilfully and intentionally attempted to perpetrate a fraud on the other parties in this case, on the system of civil justice generally, and on the Court.[2]

Perhaps not surprisingly, given the gravity of the allegations against Lynch, he never suggested during the proceedings relating to the Sanctions Motion that any sanction short of dismissal with prejudice would be appropriate if Lynch were found, as he has been, to have engaged in the charged document fabrication and perjury. The Court has nonetheless independently considered whether some other, lesser sanction would be appropriate. After engaging in that assessment, the Court cannot conclude that any lesser sanction would be reasonable, fair, or just. As precedent teaches, dismissal with prejudice is not only proportionate to the offenses at issue, but any lesser sanction under the circumstances (such as merely excluding the fabricated documents) would unfairly minimize the seriousness of the misconduct and fail to deter sufficiently such misconduct by others in the future.

The Sanctions Motion (D.E. 161) is granted, and Lynch's third-party complaint against Seyfarth Shaw and Karlin is dismissed with prejudice. The summary judgment motion of Seyfarth Shaw and Karlin against Lynch's third-party claims (D.E. 129) is dismissed as moot. REP's summary judgment motion (D.E. 120) against Lynch concerning his liability under the Guaranty is granted.

---

[2]     The Court issued an oral ruling on January 25, 2004, concerning the Sanctions Motion. (*See* D.E. 169.) This opinion gives a more detailed explanation for the Court's ruling and also grants REP's summary judgment motion concerning Lynch's personal liability on the Guaranty. The Court intends and believes that this opinion is consistent with its oral ruling. To the extent there is any unintended conflict, the written opinion controls; to the extent the oral ruling addressed a subject that is not addressed in this written opinion, the Court also relies on the oral ruling.

I.    FACTS[3]

A.    Introductory Backdrop

Defendant, Michael Lynch, is a young entrepreneur who engaged in hundreds of millions of dollars in transactions in the last fifteen years or so, largely in the area of distressed real estate and distressed business acquisition. (Sanctions Hr'g Tr. at 232-33, 330-31.) He has, or at least had, a controlling and/or substantial interest in various business entities. (*E.g.*, *id.* at 232, 243, 331.) In connection with his business endeavors, he has been personally involved in financing over $460 million in debt since 1991. (*Id.* at 239, 330.)

As Lynch described it,[4] in the summer of 1998, Lynch and a group of business associates

---

[3]    The Court hereby enters the following Findings of Fact and Conclusions of Law, which are expressly based upon consideration of all of the admissible evidence, as well as the Court's own assessment of the credibility of the witnesses. As Judge Castillo stated when granting a similar motion, to the extent any finding of fact stated might be deemed a conclusion of law, it should be considered a conclusion of law. *See Quela v. Payco-General Am. Creditas, Inc.*, No. 99 C 1904, 2000 WL 656681, at *1 (N.D. Ill. May 18, 2000). The same is true as to any stated conclusion of law. *See id.*

[4]    The general history leading to the 1998 Guaranty (set forth herein as the "Introductory Backdrop") was not in material dispute in connection with the Sanctions Motion, so the Court will take Lynch's description of it for present purposes, given that nothing relating to the Court's ruling turns on it and Lynch set forth the background in the greatest detail. In doing so, the Court does not wish to imply that it found Lynch's testimony generally credible. To the contrary: to the extent Lynch's testimony conflicted with witnesses of the Movants or the other evidence in the case, the Court rejected Lynch's testimony as not credible and, in instances discussed below, found it on repeated occasions to be wilfully false and perjurious. Moreover, in the event that matters related in this general history are relevant to other disputes between the parties, nothing in this opinion should be understood to create factual findings in favor of Lynch that might have collateral estoppel effect. The Court simply relates Lynch's version of non-material general history, as he spoke about it at greatest length. If any of the issues concerning the general history were material for present purposes, the Court would not necessarily credit Lynch's version and likely would reject it unless it were specifically corroborated by non-fabricated documentary evidence. The Court does note, however, that the detail and facility with which Lynch discussed the various business and tax implications of the McCook transactions discussed *infra*, revealed his experience and familiarity with distressed real estate and business acquisitions and rendered

4

completed a business acquisition. (*Id.* at 233, 235.) As is typical in such acquisitions, there were various corporate entities involved in the acquisition and in the structuring of the final corporate landscape. In general terms, in the summer of 1998, the Lynch camp acquired, through an entity known as "McCook Metals LLC," a large distressed aluminum plant located in McCook, Illinois, for some $97 million. (*Id.*) Profits would be passed through to the entrepreneurs through the LLC entity. (*Id.* at 235.) In general terms, Seyfarth Shaw and Karlin were attorneys who counseled Lynch and/or his camp in connection with the McCook acquisition and the eventual Guaranty, which was completed as one of the various corporate moves that followed the initial acquisition.[5]

---

patently incredible his subsequent testimony on cross-examination that he needed to have the concept of corporate bankruptcy explained to him because of his unfamiliarity with it. (Sanctions Hr'g Tr. at 247, 330-32.)

[5]      As has been clear since this Court inherited this case, the parties are engaged in litigation against each other in multiple fora, including the U.S. Bankruptcy Court for the Northern District of Illinois and the Circuit Court of Cook County, Illinois. As the Court understands it, at least some of that litigation may involve disputes concerning whether Seyfarth Shaw and its attorneys committed malpractice by representing clients with conflicting interests and/or by failing to disclose potential conflicts to their clients, including Lynch. This Court obviously is not presiding over those other cases, and nothing in this opinion is meant to speculate or comment on issues in them. In addition, although the Court informally refers at points to Seyfarth Shaw and its members as "attorneys" for Lynch and the business entities involved in the McCook transaction, this Court has not received evidence concerning, and certainly makes no findings concerning, whether any member of Seyfarth Shaw served as an "attorney" or had an attorney-client relationship with any particular entity or person in the Lynch camp during the McCook transactions or the dealings with Morgan Guaranty Trust Company of New York. Similarly, this Court has received no evidence concerning, and makes no findings concerning, whether any conflict of interest of any sort existed for Seyfarth Shaw or Karlin. Such conflict of interest issues can implicate difficult, and sometimes technical, questions that were not briefed or considered here. Thus, the Court's intermittent references to Seyfarth Shaw and Karlin as "attorneys" for Lynch and the entities in which he had interests are not intended to be conclusions concerning issues not before this Court in connection with Lynch's alleged and proven document fabrication and perjury. Put differently, to the extent anyone would try to argue that this Court's references to putative attorney-client relations would have potential collateral

Approximately 30 days after the closing of the acquisition, Lynch and his fellow entrepreneurs began considering further corporate moves that would enure to their benefit from a tax perspective. (*Id.*) The purchased assets would be restructured into seven or eight different limited liability corporations, with a reallocation of the purchase price based on third-party appraisals. (*Id.* at 236.) The restructuring also was attractive because it would, among other things, allow the Lynch camp to eliminate the potential of other participants to acquire substantial additional equity ownership interests in upcoming years. (*Id.* at 237.) The potential would have allowed those other participants to move from 5% to 30% equity ownership positions, in an entity or entities that Lynch believed were worth, or at least could be worth, anywhere from $80 million, to $150 million, to as much as $1 billion dollars.[6] (*Id.* at 237, 282.) In addition, the additional corporate moves that were being contemplated would allow Lynch and his colleagues to free up 150 acres of land at the aluminum plant, which Lynch believed had a potential development value for them of $100 to $150 million. (*Id.* at 237.) Lynch admitted that he saw the potential moves as presenting a "very unique opportunity" for him and his associates. (*Id.*)

The corporate moves also would involve placing a new long-term mortgage on the

estoppel effect in other cases, in this Court's view at least, that would be an inappropriate outcome, as this Court has not received briefing or complete evidence on the issue(s) and has not considered, much less attempted to resolve, the nuanced issues that would attend such an analysis.

[6] The Court is familiar with the vagaries that typically attend corporate valuation efforts. The specific value of the corporation, or its specific potential value if various other moves were successfully completed, is not material. What is clear is that Lynch believed McCook offered an attractive business opportunity, and that if the transaction's potential were realized, Lynch clearly stood to gain personally and substantially from it.

property that would remain in use as an aluminum plant. (*Id.* at 238.) Lynch engaged his former fraternity brother, an investment banker named Scott Miller of Cohen Financial in Chicago, to help broker the transaction. (*Id.*) Lynch was the person from his group who negotiated the mortgage, and Lynch was also the lead person involved in the McCook Properties endeavor overall. (*E.g., id.* at 322; Mov. Ex. 8.) He owned, directly or indirectly, approximately 49-51% of McCook Properties, and he was the leading actor related to it. (Sanctions Hr'g Tr. at 322.)

As discussed immediately below, Lynch eventually negotiated for $30 million in financing for the ongoing aluminum operations with Morgan Guaranty Trust Company of New York ("Morgan"). In connection with that loan, Lynch executed a personal Guaranty that, as the Court explains in detail below, obligated Lynch to personally guaranty the obligations of McCook Properties, LLC ("McCook Properties") in the event of a default, which could include, among other things, a voluntary bankruptcy filing by McCook Properties.

B.      The Morgan Guaranty Trust Company of New York Transaction[7]

---

[7]      Virtually all of the facts concerning the mortgage transaction and the Guaranty involving Morgan Guaranty Trust Company of New York ("Morgan") and Michael Lynch are taken from the summary judgment briefing between Lynch and REP MCR Realty, L.L.C. ("REP"). (REP acquired Morgan's interest in April 2003, after this lawsuit was filed, and REP and was substituted into the litigation under Federal Rule of Civil Procedure 25(c). (*See* D.E. 88 (Minute Order of Judge Gettleman granting Rule 25(c) motion).) The overwhelming majority of facts concerning the 1998 Loan, Note, Security Agreement, and the Lynch-Morgan Guaranty are undisputed. In relating these facts, and in granting REP's summary judgment motion on the Guaranty claim against Lynch, the Court has applied Seventh Circuit precedent concerning analysis of a summary judgment motion and factual assertions related to it. *See, e.g., Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004) (court resolves genuine factual ambiguities in non-movant's favor); *see also Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000) (stating that the Seventh Circuit has "consistently and repeatedly upheld a district court's discretion to require strict compliance" with L.R. 56.1); *Malec v. Sanford*, 191 F.R.D. 581, 584 (N. D. Ill. 2000) (failure to adhere to L.R. 56.1 requirements, including citation to specific evidentiary materials justifying denial, is equivalent to admission).

On December 30, 1998, Morgan officially entered into a loan with McCook Properties for $30,850,000 ("Loan"). (D.E. 121 ¶¶ 7-8.) The Loan was evidenced by, among other things, a fixed rate note for $30,850,000 issued by McCook Properties to Morgan dated December 30, 1998 ("Note"), and it was secured by, among other things, a Mortgage and Security Agreement ("Security Instrument"). (*Id.* ¶ 8.) Michael Lynch, President of Cloverleaf Holdings, Inc., the managing member of McCook Properties, executed the Note and Security Instrument on behalf of McCook Properties. (*Id.* ¶ 9; D.E. 139 ¶ 9.) The parties (*i.e.*, REP and the Movants generally, on the one hand, and Lynch, on the other) vary slightly in their estimation of how much of McCook Properties Lynch owned, although the difference appears to be inconsequential. REP maintains that Lynch "owned approximately fifty percent of McCook Properties" (D.E. 121 ¶ 9), while Lynch explains that he owned between forty-nine and fifty-one percent (Sanctions Hr'g Tr. at 322). More specifically, although Lynch disputes that he owned 50% of McCook Properties, he acknowledges that he owned 50% of McCook Metals LLC, which was a 99% owner of McCook Properties. (D.E. 139 ¶ 9.) In any event, Lynch was the moving force and biggest player in the McCook transaction, at least with respect to issues implicated by the pending motions.

The Security Instrument granted a first priority security interest to Morgan in certain real property, and the Note required that McCook Properties make a "constant payment" of $268,309.52 to Morgan on the first day of each calendar month, up to and including December 2008. (D.E. 121 ¶¶ 10-11.) Failure to pay any amount due under the Note prior to the tenth calendar day after that amount becomes due is an "Event of Default" as defined under the Note and Security Agreement. (*Id.* ¶ 12.) In addition, McCook Properties covenanted not to file a

8

voluntarily bankruptcy petition under Section 4.3(u) of the Security Instrument. (*Id.* ¶ 13.)

Pursuant the terms of the contract, failure to comply with the covenant not to file a voluntary

bankruptcy petition is an "Event of Default." (*Id.* ¶ 14.) Section 5 of the Note and Section

10.1(c) of the Security Instrument both authorized Morgan to accelerate the Loan and to declare

it "immediately due and payable," without notice or demand to McCook Properties, so long as an

Event of Default existed. (*Id.* ¶ 15.)

Lynch executed a Guaranty dated December 30, 1998, which identified him as the

Guarantor. (*Id.* ¶ 19.) Morgan required Lynch to sign the Guaranty in his individual capacity,

not as a corporate officer, as evidenced by the signature block for the Guaranty. (*Id.* ¶ 22.) The

Guaranty does not identify itself as a corporate guaranty, and it does not identify McCook

Properties or any other person or entity other than Lynch as the Guarantor. (*Id.*) Section 1.1 of

the Guaranty provides:

> Guarantor hereby absolutely, irrevocably, and unconditionally guarantees to Lender
> [Morgan] (and its successor and assigns), jointly and severally, the payment and
> performance of the Guaranteed Obligations as and when the same shall be due and
> payable . . . . Guarantor hereby absolutely, irrevocably, and unconditionally covenants
> and agrees that it is liable, jointly and severally, for the Guaranteed Obligations as a
> primary obligor, and that each Guarantor shall fully perform, jointly and severally, each
> and every term and provision hereof.

(*Id.* ¶ 24.)

Section 1.2, on page 2 of the Guaranty, defined which obligations were "Guaranteed

Obligations." It provided that "in the event . . . (ii) of Borrower's [McCook Properties'] breach

or default, under <u>Sections 4.3 or 8.2</u> of the Security Instrument, or (iii) of the Property or any part

thereof becoming an asset in a voluntary bankruptcy or voluntary insolvency proceeding, then the

Guaranteed Obligations shall also include the unpaid balance of the Debt (as defined in the

Security Instrument)." (*Id.* ¶ 25 (underlining in the Guaranty).) Section 1.5 states:

> If all or any part of the Guaranteed Obligations shall not be punctually paid when due, whether at maturity or earlier by acceleration or otherwise, Guarantor shall, immediately upon demand by Lender, and without presentment, protest, notice of protest, notice of non-payment, notice of intention to accelerate the maturity, notice of acceleration of the maturity, or any other notice whatsoever, pay in lawful money . . . the amount due on the Guaranteed Obligations to Lender . . . .

(*Id.* ¶ 28.) The Guaranty also explained that the Lender need not first institute or exhaust its

remedies against the Borrower, McCook Properties, before enforcing the Guaranty against the

Guarantor. (*Id.* ¶ 29.)

Section 5.5 limited the method of amending the Guaranty to "an instrument in writing

executed by the party or an authorized representative of the party against whom such amendment

is sought to be enforced." (*Id.* ¶ 35.) Section 5.11 made clear that the Guaranty embodied

> THE FINAL, ENTIRE AGREEMENT OF GUARANTOR AND LENDER WITH RESPECT TO GUARANTOR'S GUARANTY OF THE GUARANTEED OBLIGATIONS AND SUPERCEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF. THIS GUARANTY IS INTENDED BY GUARANTOR AND LENDER AS A FINAL AND COMPLETE EXPRESSION OF THE TERMS OF THE GUARANTY, AND NO COURSE OF DEALING BETWEEN GUARANTOR AND LENDER, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES, AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS GUARANTY AGREEMENT.

(*Id.* ¶ 36 (capitalization in the Guaranty).)

In August 2001, McCook Properties defaulted on the loan when it did not pay the

required installments of the principal and interest. (*Id.* ¶ 37.) On August 16, 2001, Morgan sent

a default letter to McCook Properties and accelerated the Note. (*Id.* ¶ 38.) On December 3,

2001, McCook Properties filed a voluntary bankruptcy petition under Chapter 11 of Title 11 of the United States Code. (*Id.* ¶¶ 40-41.) On December 7, 2001, and December 11, 2001, Morgan sent Lynch letters demanding that he perform on the Guaranty and pay the Guaranteed Obligations immediately. (*Id.* ¶ 42.) Lynch responded that he did not believe himself to be personally liable under the Guaranty. (*Id.* ¶ 43.) Lynch did not pay, and has not paid, any amounts under the Guaranty, Note, or Security Instrument. (*Id.* ¶ 44.)

On January 17, 2002, Morgan filed suit against Lynch on the Guaranty. (D.E. 1.) As explained, REP came into the litigation when Judge Gettleman granted leave, under Federal Rule of Civil Procedure 25(c), for REP to substitute as Plaintiff after an April 2003 reassignment of Morgan's interest. (D.E. 88.) With respect to REP's pending summary judgment motion, the parties disagree over the amount of damages Lynch potentially owes. These disagreements are discussed below, when the Court considers REP's summary judgment motion at the end of this opinion in Section III.

C.    The Production of the Three Documents at Issue in the Sanctions Motion and the Filing of Lynch's Third-Party Complaint Against Seyfarth Shaw and Karlin

As discovery was proceeding between the parties, in connection with this case and their litigation in other fora, the three documents central to the Sanctions Motion at issue here were discovered and produced. Specifically, in a supplemental document production in late 2002, Lynch's attorneys produced three important documents (*infra* at 13-14) that are the subject of the Sanctions Motion *sub judice.* (Cronin Dep. at 90, 92; D.E. 155, Ex. A ¶ 5.)[8] There is no

---

[8]    The Court wishes to make three things very clear. First, no one has alleged that Lynch's attorneys engaged in any fraud or unethical conduct. Rather, the Movants have alleged (and the Court finds) that Lynch has engaged in wilful document fabrication, which offense he compounded by engaging in the provision of wilfully false testimony and perjury. Second, and

meaningful dispute that these documents are and were of great significance: as one of Lynch's attorneys subsequently testified, when he first saw them, he said, "Wow. Isn't this great?" (Cronin Dep. at 94.) Lynch's counsel also reviewed and relied on these (forged) documents when they were drafting Lynch's third-party indemnification claim against Seyfarth Shaw and Karlin. (*Id.* at 90-91.) Lynch's counsel also relied on these documents when taking the deposition of Karlin prior to the filing of Lynch's third-party claims. (Sanctions Hr'g Tr. at 217-18, 230.) The documents were of great importance because they were corroboration for important aspects of Lynch's claims against Seyfarth Shaw and Karlin.

In this regard, in his third-party complaint against Seyfarth Shaw and Karlin, Lynch alleged among other things that, because of the alleged malpractice and incompetence of Seyfarth Shaw and its attorneys, Lynch was led to execute the Guaranty notwithstanding that he had "explicitly instructed Karlin and Seyfarth [Shaw] that any so-called personal guaranty would not be acceptable." (D.E. 62 (Third Party Complaint) ¶ 1.)[9] Lynch also rejected the notion that he ever agreed that any liability would be triggered by a corporate bankruptcy. (*See, e.g., id.* ¶ 8

---

relatedly, this opinion does not find that Lynch's attorneys engaged in any fraud or unethical conduct. Third, Lynch has never argued that the non-involvement of his attorneys in his fraud makes any difference in terms of the propriety of sanctions or the level of sanctions that are appropriate. This is not surprising: the creation and production of the critical documents warrants dismissal with prejudice of Lynch's third-party claim under federal caselaw, and Lynch's own personal misconduct is no less objectionable because he was the mastermind and performer of the fraud.

[9]     *Accord id.* ¶ 9 ("McCook and McCook Properties would not have entered into any agreement whatsoever with Morgan had Lynch understood that the qualified and limited guaranty of an officer of McCook Properties would implicate personal liability."); *id.* ¶ 8 ("Lynch made clear that if Morgan required more than this qualified and limited guaranty, McCook would simply 'walk away' from the negotiations."); *id.* ¶ 10 ("Seyfarth [Shaw] and Karlin never advised that any so-called personal guaranty was at issue.").

("Lynch advised that McCook Properties would accept only a qualified and limited guaranty by an officer of McCook Properties which could be triggered only by fraud, wasting of assets or gross mismanagement.").)

Although Lynch was sued on the Guaranty in January 2002 (D.E. 1), he did not file a third-party complaint against Seyfarth Shaw and Karlin seeking indemnification, until after the discovery and production of the three documents at issue in the Sanctions Motion. (Cronin Dep. at 90.) Lynch's third-party complaint was advanced in January 2003. (D.E. 62.)

      1.    Substance of the Three Challenged Documents

The three "new" documents produced by Lynch's counsel, and at issue through the Sanctions Motion, included the following. First, there was a purported draft of the Guaranty that Lynch eventually signed, hereinafter referred to as the "Lynch Draft Guaranty" or "LDG." (Mov. Ex. 11.) The LDG appeared to look like all the other drafts and the eventual signed original, except for a number of significant differences on pages 2 and 13, as discussed at length below. Specifically, pages 2 and 13 of the LDG contained numerous different indicia of forgery that distinguished those two pages of the LDG from all other pages of the Guaranty and its drafts, including page 1 and pages 3-12 of the LDG itself. As for substantive terms, only pages 2 and 13 of the LDG (and not any other pages of any other draft or the execution copy) supported Lynch's positions that (1) he had agreed to something other or less than a personal guaranty; and (2) he had not agreed to a voluntary bankruptcy trigger for the personal guaranty.

The second significant document produced by Lynch's counsel was a December 1, 1998 letter (the "December 1 Letter") that Lynch undisputably authored and signed. (Mov. Ex. 9.) The December 1 Letter, which purportedly was sent by Lynch to Edward Karlin at Seyfarth Shaw,

stated that:

> We have received the Morgan Guaranty documents that were sent to us today from your offices. We will forward our comments to you shortly. Per our phone conversation today, the partners will not sign a personal guarantee for this mortgage loan. No personal guarantee was ever mentioned to us by Morgan Guaranty.

> It is our understanding via Scott Miller of Cohen Financial that Morgan Guaranty only requested that an officer of McCook Properties LLC., guarantee only the typical mortgage loan carve outs such as fraud, wasting of the assets, and gross mismanagement. A bankruptcy filing (voluntary or involuntary) is not what we agreed to. Scott Miller confirmed with Jim McCall and I that this is a nonrecourse loan and does not require a personal guarantee by the partners.

> If this is not Morgan's position, then we have no other choice then to walk away from the Morgan Mortgage, despite pressures from GE Capital & PPM Finance to be paid off on the Term B and Term C loans.

> Please let us know immediately what Morgan's attorneys intend to do with this issue.

> Sincerely,
> Michael Lynch

(*Id.*) As explained below, the December 1 Letter, which Lynch concedes he signed and authored, is demonstrably false in multiple significant respects.

The final letter produced in the late 2002 production was dated December 28, 1998 (the "December 28 Letter"). (Mov. Ex. 10.) The December 28 Letter was purportedly sent to Edward Karlin. It stated:

> Dear Ed,

> Per your instructions, attached are the executed five (5) signature plates that you requested Michael Lynch sign as Chairman of McCook Properties LLC. If you have any questions before the closing this week, Michael will be in the office tomorrow.

> Sincerely,

> James C. McCall

14

CC: Michael Lynch

(*Id.*) James C. McCall is a former business associate of Lynch's, who is not alleged to be a part of the Lynch fraud. This letter also contains material falsehoods that reveal the fabricated nature of the document, as discussed below.

On February 11, 2004, Seyfarth Shaw and Karlin filed their Sanctions Motion, alleging that Lynch fabricated these three documents and "foist[ed] [them] upon the Court." (Mem. in Supp. of Seyfarth Shaw and Edward J. Karlin's Mot. for Sanctions (D.E. 112) at 1.)[10] Briefing proceeded on that motion—with Lynch filing a response (D.E. 133), and Karlin and Seyfarth Shaw filing a reply (D.E. 140).[11] During the course of the briefing, the Court granted repeated requests by Lynch for extensions of time so as to accommodate circumstances facing Lynch and his counsel (such as Lynch's claimed need for additional discovery and a change of firms for certain of Lynch's counsel). During this initial portion of the briefing on the Sanctions Motion, Lynch largely argued that the Movants had failed to prove their case by clear and convincing evidence, and he filed no affidavit specifically denying the fabrication.

During the briefing cycle, the Court also granted Lynch's motion to file a surreply. In the surreply, which was filed on July 28, 2004, Lynch for the first time submitted an affidavit concerning the Sanctions Motion, in which he offered testimony. (D.E. 155.) Lynch asserted that his belated testimony, which was arguably vague in at least some respects, undermined the Movants' case. (D.E. 160 at 2.) The affidavit was offered on the express or implicit premise that

---

[10]     On March 3, 2004, this case was reassigned to this Court from the calendar of United States District Judge Robert Gettleman.

[11]     REP also filed a brief joining in the Sanctions Motion (D.E. 132).

15

Lynch was somehow precluded from testifying live because of the parties' prior statements (made before Lynch submitted his affidavit) that they did not believe a live hearing was needed to resolve credibility issues. (*Id.*)

On August 31, 2004, the Court ordered the parties to rebrief the Sanctions Motion on the express premise, issued by the Court, that "either party will be able, at the conclusion of the expedited briefing, to present whatever live testimony it chooses, and neither party will be precluded from presenting live testimony if any other party chooses not to present live testimony . . . . Put differently, if Mr. Lynch would like to testify live, he will be entirely free to do so . . . ." (*Id.*) The Court felt such a step was appropriate and necessary because it appeared, with all respect, that Lynch might be engaging in eleventh-hour gamesmanship. Given the gravity of the allegations, and the interests of all parties and the system of civil justice generally in resolving matters such as the Sanctions Motion on the basis of a clear and level playing field, the Court wanted to make sure every side had an opportunity to present fully and fairly their respective positions and to have the Sanctions Motion fairly resolved on the merits.

The parties engaged in rebriefing, and this Court held a two-day hearing on the Sanctions Motion on January 20 and 21, 2005. Both sides were given an opportunity to present witnesses and arguments. As the Court indicated in its oral ruling of January 25, 2005, the evidence adduced at that hearing unfortunately made clear that Mr. Lynch engaged in multiple acts of wilful document fabrication and perjury.

II.    MOTION FOR SANCTIONS

    A.    Authority to Impose Sanctions

The parties do not dispute that this Court has the power to sanction Lynch if he has

engaged in document fabrication and/or perjury, including through the sanction of dismissal with prejudice of Lynch's claims against Seyfarth Shaw and Karlin. Precedent unquestionably supports that implicit agreement of the parties. *See, e.g., Pope v. Fed. Express Corp.*, 974 F.2d 982, 984 (8th Cir. 1992) ("Dismissal of Pope's lawsuit is a severe sanction, yet under the circumstances we cannot find that such a sanction constitutes an abuse of the district court's discretion. The dismissal of Pope's suit was based on the district court's finding that manufactured evidence and perjured testimony had been introduced in an attempt to enhance the case through fraudulent conduct."); *Kovilic Constr. Co., Inc. v. Missbrenner*, 106 F.3d 768, 773 (7th Cir. 1997) ("The cases that have upheld dismissals as a sanction based on inherent powers have typically involved bad faith, fraud, or undue delay by one of the parties."); *Quela v. Payco-General Am. Creditas, Inc.*, No. 99 C 1904, 2000 WL 656681, at *7 (N.D. Ill. May 18, 2000); *Brady v. United States*, 877 F. Supp. 444, 452-53 (C.D. Ill. 1994).[12]

Precedent teaches that a district court's authority to impose such sanctions comes from two sources: Federal Rule of Civil Procedure 37 and the Court's own inherent powers. *See, e.g., Quela*, 2000 WL 656681, at *6. Federal Rule of Civil Procedure 37(b)(2) states that, if a party disobeys a discovery order, the court can respond with a variety of measures, including dismissal of the action or proceeding at issue. *See* Fed. R. Civ. P. 37(b)(2)(A)-(E). In addition, the Court may require that the wrongful party pay costs and attorneys' fees. *See* Fed. R. Civ. P. 37(b)(2).

---

[12]     *See also, e.g., Jimenez v. Madison Area Tech. Coll.*, 321 F.3d 652, 657 (7th Cir. 2003); *Aoude v. Mobile Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989) (upholding dismissal with prejudice as sanction in situation where party fabricated an important document and gave it to his attorney, and stating that "the present case is a near-classic example" of "fraud on the court"); *Vargas v. Peltz*, 901 F. Supp. 1572, 1579 (S.D. Fla. 1995) ("The cases cited . . . in which federal courts dismissed claims for a party's fabrication of evidence are particularly applicable here.").

Although Rule 37 requires a party to violate a judicial directive in order to impose sanctions, "a formal, written order to comply with discovery is not required." *Quela*, 2000 WL 656681, at *6. Courts are entitled to interpret broadly what constitutes an order. *See id.* ("In this case, although there has been no specific court order, we believe such an order is not required to provide notice that parties must not engage in such abusive litigation practices as coercing witness testimony, lying to the court, and tampering with the integrity of the judicial system.") (collecting cases). The latitude to interpret broadly stems from the presumption that all litigants, including those far less educated and intelligent than those involved in this case, are reasonably deemed to understand that fabricating evidence and committing perjury is conduct of the sort that "is absolutely unacceptable." *Id.* (collecting cases).

Lynch raises no objection based on whether there is authority to sanction him under Rule 37. Even if Rule 37 somehow did not provide authority, however, it would be of no moment, because it is settled that federal courts have inherent powers to sanction litigants for bad-faith and fraudulent conduct related to federal cases. These powers "'are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-31 (1962)). A court's inherent powers also include the power, in appropriate cases, to impose the sanction of dismissal with prejudice. *See, e.g., Diettrich v. Northwest Airlines, Inc.*, 168 F.3d 961, 964 (7th Cir. 1999) (inherent powers "permit a court to impose the ultimate sanction of a grant of judgment (or its equivalent, dismissal with prejudice)"); *Kovilic*, 106 F.3d at 773. "Although dismissal with prejudice is a permissible judicial sanction for fraud on the court, the general rule is that before

18

dismissing a suit with prejudice as a sanction for misconduct a court should consider the adequacy of a less severe sanction." *Oliver v. Gramley*, 200 F.3d 465, 466 (7th Cir. 1999) (internal citations omitted). The Court will proceed accordingly.

The parties also are in agreement as to the applicable standard of proof that the Movants must satisfy—namely, the standard of clear and convincing evidence. (*See* Lynch's "Response to Renewed Motion for Sanctions" (filed Sept. 28, 2004) at 2 ("Seyfarth Shaw and Karlin bear the burden here of establishing by clear and convincing evidence their claim . . . .");[13] Mem. in Supp. of Seyfarth Shaw and Edward J. Karlin's Renewed Mot. for Sanctions (D.E. 161) at 4 (Movants acknowledging that, "[t]he burden of proof on this motion is clear and convincing evidence").) Their understanding is in accord with precedent—*see, e.g., Maynard v. Nygren*, 332 F.3d 462, 468 (7th Cir. 2003)—and the Court accordingly will apply this standard of proof.

B.     Analysis of Merits of Sanctions Motion

Resolution of the Sanctions Motion requires the Court to answer two interrelated and fundamental questions. First, are the three documents at issue in this case—the LDG, the December 1 Letter, and the December 28 Letter—fabricated? If the first question is answered in the affirmative, it gives rise to the second question: who is responsible for the fabrication? After considering all the evidence and testimony provided at the Sanctions Hearing, the Court concludes that Movants have demonstrated by clear and convincing evidence that (1) all three documents are, indeed, fraudulent and in no ways just mistakes or genuine; and (2) Lynch is

---

[13]     It is unclear whether Lynch's September 28, 2004 response was ever tendered to the District Court clerk's office for filing or whether the document was not assigned a formal docket entry for some other reason. The Court received a stamped copy of the document so the Court will simply cite to it as "Lynch's September 28, 2004 Response."

responsible for the fabrication.

      1.    The Three Documents Were Fabricated

Movants maintain that the three relevant documents, the December 1 Letter, the LDG, and the December 28 Letter are forgeries. Lynch asserts that while the three documents may contain some mistakes and the LDG contains differences from other versions of the Guaranty, those differences do not amount to proof that the documents were forgeries. (Sanctions Hr'g Tr. at 25.) After two days of hearings and considering numerous exhibits and witnesses' testimony, the Court concludes that the documents were, indeed, forged.[14]

      a.    The LDG Was Forged

Substantial and interrelated documentary and testimonial evidence made clear that the anomalous pages 2 and 13 of the LDG, which are the pages that would benefit Lynch more than anyone else in the world, are forgeries. There are numerous objective indicia of fraud, which reveal that the pages are fakes; not coincidentally, the faked pages are the ones (indeed, it appears, are the only documentary or "objective" evidence, in tandem with the other two faked documents) that substantively support Lynch on central aspects of his case.

To begin, there are multiple different objective indicia of fraud that reveal that pages 2 and 13 of the Lynch Draft Guaranty are not authentic pages of any draft of the Guaranty document.

---

[14]     Throughout this opinion, the Court has endeavored to provide supporting and exemplary (*i.e.*, representative) record cites for all material factual findings. The cited record material is typically not the only evidence supporting each respective factual conclusion, and to the extent there is other support in the record for a factual finding, the Court relies upon such evidence even though it would not be practical to cite every piece of testimony or exhibit that supports each factual conclusion.

The first four objective indicia of fraud relate to the "footer" areas of pages 2 and 13 of the LDG as compared to all other pages of any draft or executed version of the Guaranty, including the other eleven pages of the LDG that do not contain substantive changes that benefit Lynch. As was explained by the testimony offered by Movants, the Guaranty document that Morgan used in this transaction was essentially a boilerplate document for Morgan, which it routinely used for these types of transactions. (*See, e.g., id.* at 37-38; Thompson Dep. at 12.) The Guaranty was generated from a generic template, and there was little if any modification ever permitted because these loans and guarantees were part of a high-volume area of Morgan's business: the loans were securitized and resold to others, and they needed to have consistent terms and obligations in that regard. (*See, e.g.,* Thompson Dep. at 12, 16; Sanctions Hr'g Tr. at 37.)

Because of the need for standardized documents, Morgan and its attorneys insisted that Morgan's attorneys control the drafts of documents such as the Guaranty. (Sanctions Hr'g Tr. at 37-38.) In this case, Morgan was represented by the law firm of Womble Carlyle Sandridge & Rice ("Womble Carlyle") in Atlanta, Georgia. (*See, e.g., id.* at 37; Mov. Ex. 2.) Womble Carlyle uses word processing and document control systems that have been typically employed in medium and large law firms for many years. As is typically the case, Womble Carlyle's word-processing system placed a distinctive document control number (sometimes referred to within law firms as the "DCN") in the bottom left portion of the "footer" of each page of a document such as the Guaranty. (*E.g.,* Thompson Dep. at 18; Wiley Dep. at 17-18.) The footer is a standard, stock portion of a document produced by Womble Carlyle, a "label that appears at the bottom of each page" (Wiley Dep. at 26), that is placed on every page of a document by the word

21

processing software (*id.* at 26-27).

The document control number is like a finger print, in that each DCN is a unique number respectively assigned to each new document created by Womble Carlyle, as assigned in sequential order based on when the document was created. (*Id.* at 17.) As a document goes through various new drafts, Womble Carlyle's computer software automatically appends an additional identifier to the end of the document control number. (*Id.* at 18.) Thus, every document concerning the Guaranty in the McCook Properties loan had the number "A#118883," followed by a period and the version number. (*Id.* at 18-19.) For example, the final version of the Guaranty, version four, had document number "A#118883.4." (Mov. Ex. 8; Wiley Dep. at 19.)

On all pages of the LDG, other than the faked pages 2 and 13, the document control number appears as one would expect, "A#118883.2." (Mov. Ex. 11.) This number is from the computer system and is consistent with all the other documentary evidence in the case. On page 2 of the LDG, however, the DCN appears as "A#1 18883.2," such that there is a gap between the first two numbers of the DCN. (*Id.* at 2.) The DCN on page 13 of the LDG is even more dubious; it appears as "A~1 13383.2." (*Id.* at 13.) Terry Wiley is the Executive Director at Womble Carlyle, and he is in charge of administration and support for its 1200 personnel, including the technology and support systems such as the computer and word processing systems. (Wiley Dep. at 6-8.) He explained that electronic and documentary records established that the actual version 2 of the Guaranty was printed only once. (*Id.* at 25-26; Mov. Ex. 12 at 1.) He also explained that the erroneous "document control numbers" which appear on page 2 and page 13 of the LDG reveal that the pages were not generated by any Womble Carlyle system.

(Wiley Dep. at 25-31.) As for the DCN on page 13, he said it indicates that page 13 was printed from an older version of a word processing system not even used by Womble Carlyle. (*Id.* at 29-30.)

Wiley also discussed three other footer discrepancies in pages 2 and 13 of the LDG besides the two DCN discrepancies. Specifically, on all other pages of the LDG and in every other version of that document, the title of the lender, Morgan Guaranty Trust Company, appeared in a font style known as "initial cap" font in the lower right hand corner of each page, while on pages two and thirteen of the LDG, the title of the lender erroneously appears in all capitals ("all caps"). (*Id.* at 31-33; *compare also* Mov. Ex. 4 at 2, 13 (footers in genuine draft pages 2 and 13) *with* Mov. Ex. 11 at 2, 13 (incorrect footers in LDG).) In addition, the page number in the footer of page 2 of the LDG is above the horizontal line that contains the DCN and the client-lender's name, while the page number on every other page of the LDG has the page number even with the DCN and client-lender's name, which led Wiley to conclude that page 2 of the LDG did not come from Womble Carlyle. (Wiley Dep. at 31; *see also* Sanctions Hr'g Tr. at 37-38.) This collection of discrepancies led Mr. Wiley to conclude that there was no way pages 2 and 13 of the LDG could have been prepared on a Womble Carlyle computer. As previously stated, Womble Carlyle insisted on maintaining control of the actual document, and the document control system at Womble Carlyle indicated that draft number 2 of the Guaranty (which is supposedly the draft embodied by the LDG, notwithstanding that there was another draft that was consistent with all other versions of the Guaranty and that did not have the Lynch-friendly substantive changes) had only been printed once. (*E.g.*, Wiley Dep. at 25-33; Sanctions Hr'g Tr. at 37-39; Mov. Ex. 4; Mov. Ex. 12 at 1.)

Many other indicia of fabrication exist with respect to pages 2 and 13 of the LDG. For example, the first sentence of page 13 of the LDG erroneously drops a word that is not omitted in any other version of the document, including in the actual draft version 2 of the Guaranty that the LDG purports to be. Specifically, the first sentence on page 13 (which begins on page 12) erroneously states that "[t]he exercise by Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other or remedy." (Mov. Ex. 11 at 12-13.) All other versions of the draft state, in relevant part, that such exercise "shall not preclude the concurrent or subsequent exercise of any other *right* or remedy." (*E.g.*, Mov. Ex. 4 at 13 (emphasis added); *accord* Mov. Ex. 8 at 13 (same).) The erroneously dropped "right" appears only in page 13 of the LDG.

In addition, in only page 13 of the LDG (as opposed to other versions of the document, including the actual draft version 2), the number of the subject heading for section 5.12 is mistakenly italicized; "5.12" is not in italics in any other draft, and no other section numbers are italicized in any draft. (Mov. Ex. 11 at 13; *compare, e.g.,* Mov. Ex. 4 (actual 2d draft) at 13.)

Furthermore, line nine of Section 5.12 on page 13 of the LDG erroneously states "AND EACH IS SUE AS TO WHICH THE RIGHTTO A TRIAL BY JURY WOULD OTHERWISE . . . ." (Mov. Ex. 11 at 13.) No other version of the Guaranty, including the actual draft version 2, has "IS" and "SUE" separated by a space (they all correctly contain the word "ISSUE"), nor does any other version lack a space between "RIGHT" and "TO." (*E.g.*, Mov. Ex. 4 at 13; Mov. Ex. 8 at 13.)

In addition to the aforementioned discrepancies, page 13 of the LDG, the signature page, provides for the signature on the Guaranty of the "Chairman, McCook Properties, LLC" (*i.e.*,

24

provides for something other than personal liability for Lynch). (Mov. Ex. 11 at 13.) This difference, which obviously would potentially benefit Mr. Lynch by some $30 million if it were valid, appears in no other draft of the document, including the actual version 2 of the document printed from the Womble Carlyle system. James Thompson was the attorney for Morgan at Womble Carlyle, and he controlled the Guaranty document. (*E.g.*, Thompson Dep. at 9-10; Sanctions Hr'g Tr. at 37-38.) Thompson explained that he did not believe page 13 of the LDG came from Womble Carlyle because if he ever would have drafted a signature block for a non-personal guarantee, he would have put the name of the relevant corporate entity under the listing for the guarantor, with a corresponding signature space listing the "by, name, title." (D.E. 161, Ex. F (Thompson Dep.) at 47.) As a result, he "would never have put the McCook Properties underneath the signature line" as it appears on page 13 of the LDG. (*Id.*) Thompson also testified that the "Chairman" position referenced in the signature spot of page 13 of the LDG would not make sense because, as he understood it, a "chairman" was not a type of officer able to bind a corporation, so he would have looked "for a president or vice president there." (*Id.*) Thompson further explained that page 13 of the LDG was operationally useless to him and Morgan because if all the Guaranty obligated was an officer of McCook Properties in a non-personal capacity, then "I wouldn't even have had a guaranty," because McCook Properties already had "the exact liability that this document purports to create . . . ." (*Id.*; *see also id.* at 48.) Moreover, Thompson testified that Morgan had a standard requirement of a personal guaranty from an individual in a control position over the borrower, such as Lynch, with sufficient assets to justify the lending risk. (Sanctions Hr'g Tr. at 37, 60-61.)

Three more discrepancies exist on page 2 of the LDG and implicate Section 1.2 of the

document. First, the paragraph lettering of the subparts of Section 1.2 on page 2 of the LDG is inconsistent. Unlike all other versions of the draft, which are lettered in alphabetical order with lower case letters, such as "(a), (b), (c), (d), (e)," Section 1.2 of the LDG includes subparts "(a), (b), (c), (d), (e), (l)." (Mov. Ex. 11 at 2.) The subheading of the final subpart of Section 1.2 is the wrong letter and in the wrong case. In addition, the last paragraph on all versions of page 2 of the Guaranty, except for page 2 of the LDG, has the word "Losses" in bold type, but "Losses" in the LDG is not in bold type. (Mov. Ex. 11 at 2; *compare, e.g.*, Mov. Ex. 4 at 2; Mov. Ex. 8 at 2.) Moreover, page 2 of the LDG omits a voluntary bankruptcy trigger for the Guaranty, which in the Guaranty states:

> In addition, in the event (i) of any actual fraud, willful misconduct or material intentional misrepresentation by Borrower, its general partners, if any, its members, if any, its principals, its affiliates, its agents or its employees or by any Guarantor or Indemnitor in connection with the Loan, (ii) of Borrower's breach or default under <u>Sections 4.3 or 8.2</u> of the Security Instrument, *or (iii) the Property or any part thereof becomes an asset in a voluntary bankruptcy or voluntary insolvency proceeding, then the Guaranteed Obligations shall also include the unpaid balance of the Debt (as defined in the Security Instrument).*

(Mov. Ex. 8 at 2 (italics added; underlining in original); *compare* Mov. Ex. 11 (LDG) at 2.) The omitted bankruptcy trigger on page 2 of the LDG—*i.e.*, the italicized language above in the actual Guaranty—is the trigger under which Lynch has incurred liability in this case.[15]

In the context of the evidence presented at the Sanctions Hearing, the diverse indicia of fraud on pages 2 and 13 of the LDG made clear that the LDG was a purposeful fabrication. Mr. Wiley, the systems expert at Womble Carlyle, testified that the LDG, or at least the disputed

---

[15] The Court notes that, in addition to lacking subpart (iii), this page of the LDG also lacks grammatical sense. The LDG draft, as written, contains no conjunction, specifically "or" or "and," between the first and last subparts. Thus, in the LDG it is unclear whether both events (i) and (ii) would be necessary to trigger the Guaranty.

pages of it that benefit Lynch, did not come from a Womble Carlyle system. (*E.g.*, Wiley Dep. at 24-33.) There are not only objective discrepancies in the footers, but Womble Carlyle's document control system also reflects that the document was printed only once, producing the actual version 2 of the document (under which Lynch is personally liable) that the LDG purports to be. (*E.g.*, Mov. Ex. 4; Mov. Ex. 12 at 1.) Wiley also explained that one could not change the footer in a Womble Carlyle document by accident; instead, "[i]t would be quite deliberate." (Wiley Dep. at 54.)

Lynch and Karlin also offered testimony. To be clear, as to the LDG and all other material issues, the Court credits Karlin over Lynch and, in fact, finds Lynch to have offered wilfully false and perjurious testimony at various times. The crediting of Karlin's testimony over Lynch is based on the credibility of their positions in light of other evidence presented, and on an assessment of the credibility of their live, in-court testimony. Karlin answered questions in a straightforward, credible manner while Lynch, with all respect, was often combative, offered inconsistent testimony, or could not answer questions on cross-examination in a meaningful manner at all.

As to the LDG, Karlin testified that Womble Carlyle maintained control of the transaction documents, as Mr. Thompson had directed. (Sanctions Hr'g Tr. at 37-38.) He explained that Seyfarth Shaw did not put any drafts on its systems and only made suggested edits to the Guaranty by transmitting hand-marked copies of the documents sent by Womble Carlyle back to that firm, which had control of the document. (*Id.*) Lynch, in conflict with all of the other evidence in the case and the inferences that the Court draws from it, maintained that the LDG

was authentic. (*Id.* at 326-28; *see also* D.E. 155, Ex. B (Lynch Surreply Aff.) ¶¶ 2, 10.)[16]

The evidence of Lynch's document fabrication and perjury in this case comes from many directions, and as often happens in cases, the persuasiveness of each piece of evidence is reinforced by other pieces of evidence, such that the overall mix of evidence points in a synergistic way to a single conclusion. Some of the evidence concerning the fake nature of the LDG will be discussed below, as it most naturally is addressed in the specific context of other documents. Nonetheless, the Court adds that, with respect to the LDG, the Court concludes that the frequency and nature of the discrepancies relating to pages 2 and 13 of the LDG do not allow any reasonable conclusion whatsoever that the discrepancies are the result of a massive computer glitch or some other unexplained happenstance. Mr. Lynch would need to be the unluckiest man in the world to:

> (1) be the only person to have produced a document;
>
> (2) which contains numerous inexplicable objective discrepancies—many non-substantive yet irreconcilable with the comprehensive document control system at the law firm that maintained control of the document and its drafts;
>
> (3) and which contains two other principal substantive discrepancies that make no commercial sense for Morgan but stand to be benefit Lynch personally in the potential amount of $30 million.

---

[16] Lynch offered this testimony in part of a line of questioning in which he was caught in a lie. Lynch reaffirmed prior testimony provided via affidavit in which he stated that the LDG was written, to the best of his recollection, "on or about [the] date" it bore. (Sanctions Hr'g Tr. at 326.) When asked to identify what date the LDG bore, Lynch was unable to identify one, and instead offered an evasive answer in contrived and nervous testimony that made clear he was lying. (*See id.* at 326-38.)

In this regard, it bears mention that no other participant in the transaction has any copy of the LDG in electronic or paper form in its files. (*E.g.*, Mov. Ex. 12; Sanctions Hr'g Tr. at 37-38, 136; *see also id.* at 65-66.) Moreover, to the extent there is any doubt concerning the fabricated nature of pages 2 and 13 of the LDG (and there is no meaningful doubt at all), it is worth noting that Lynch never even attempted to search, or have anyone else search, hundreds of boxes of readily available files of Seyfarth Shaw to see if another copy of the LDG (or any of the other challenged documents) could be located. (Sanctions Hr'g Tr. at 160-63.) (The Movants testified that they located no such copies. (*Id.* at 136; *see also id.* at 65-66).) Given that the recovery of even a single other copy of that sort would obviously have substantially undermined, if not destroyed, the Movants' chances of meeting their burden of proof, commonsense dictates that Lynch had every motive to search for another copy unless he already knew that the challenged documents were fake and no other copies would be found.

> b.      The December 1 Letter Is a Fake

The conclusion that the December 1 letter is a forgery comes from, *inter alia*, the collection of factual inaccuracies and objective falsities that it contains. In fact, almost every sentence of the letter is false.

For example, the first sentence of the December 1 Letter states that the author, Lynch, received the Guaranty documents "today." (Mov. Ex. 9.) However, evidence makes clear that Karlin sent the referenced documents over one week earlier, on November 23, 1998, in anticipation of a November 25, 1998, meeting with McCall and Lynch. This evidence comes in the form of testimony from Mr. Thompson, the Womble Carlyle attorney, and related documentary evidence from his firm (Mov. Ex. 2; Thompson Dep. at 22-24); documentary

29

records from Seyfarth Shaw in the form of a transmittal record and other time sheets documenting events (*see* Mov. Ex. 3; *id.* Ex. 5 at 87-88); and direct testimony (which the Court credits) from Mr. Karlin (*e.g.*, Sanctions Hr'g Tr. at 41-42). When Lynch was later fabricating the December 1 Letter or causing someone else to do it, it would have been easy to jumble relevant dates, especially if one had not assiduously constructed a timeline as reflected by all other documentary evidence and witnesses to the transaction, including disinterested ones like Thompson. However, if Lynch had truly written the letter on December 1, 1998, there is no way that Mr. Lynch, the conceded author, would have made this type of mistake.

By way of another example of the forged nature of the December 1 Letter, in it, Lynch states that he would forward his comments to Karlin about the transmitted documents "shortly." (Mov. Ex. 9.) However, Lynch had already shared his thoughts about the draft documents with Karlin at an in-person meeting that took place on November 25, 1998—a meeting reflected in Karlin's time sheets. (Mov. Ex. 5 at 87-88; *see also, e.g.*, Sanctions Hr'g Tr. at 41-44.) There was no reason for Lynch to forward comments that he had already given to Karlin, nor is there any mention of the November 25 meeting whatsoever in the bogus December 1 Letter. In addition, no evidence, certainly no credible evidence, was introduced that the there was a phone conversation, as Lynch claimed in the December 1 Letter, on that date, in which Lynch claims that he (among others) would not agree to a personal guaranty. (Mov. Ex. 9; *see also* McCall Dep. at 43-44 (testimony of Lynch's former partner, and the former CFO of McCook Metals, who contradicts the December 1 Letter and states that he never spoke with Lynch about whether McCall would execute a personal guaranty).) Rather, the evidence established that Lynch and Karlin, among others, had met on November 25, 1998, at which time Karlin explained that

30

Morgan was insisting, consistent with its general policy discussed elsewhere, that Lynch personally guarantee the loan. (Sanctions Hr'g Tr. at 41-48.[17])

The second paragraph of the December 1 Letter contains further falsehoods. For example, in it, Lynch refers to the supposed understanding of his investment banker (and college fraternity brother), Scott Miller, concerning the Guaranty. (Mov. Ex. 9.) In the December 1 Letter, Lynch maintains that Miller "confirmed . . . that this loan is a nonrecourse loan and does not require a personal guarantee by the partners." (*Id.*) This is a convenient, self-serving reiteration of a discredited statement Lynch made in the first paragraph, but Miller conceded under oath that he could not recall discussing with Lynch any issues concerning Lynch's personal liability under the Guaranty and would "doubt" that he would ever do so. (Miller Dep. at 44; *see also id.* at 45, 58.) These concessions from Miller, moreover, came in the context of an overall deposition in which his testimony made clear that he was loyal and friendly to Lynch and was begrudgingly conceding anything against him.

Paragraph three states that Morgan's insistence on personal liability would give Lynch "no other choice then to walk away from the Morgan Mortgage." (Mov. Ex. 9.) However, Lynch himself testified at trial (the first time he uttered such a statement (Sanctions Hr'g Tr. at 300)) that this was untrue—he *was* willing to concede to personal liability for a voluntary bankruptcy by McCook Properties (*id.* at 294, 299-300). Finally, the last line of the December 1 Letter states that Lynch wanted to know Morgan's stance on the issue. Given that Lynch learned

---

[17]     Lynch's counsel skillfully attempted to impeach Karlin with prior statements he made in depositions. Notwithstanding those efforts of Lynch's counsel, Karlin persuasively explained any differences between his prior testimony and his testimony at the Sanctions Hearing. Karlin's reasons, including a failure to be shown certain documents at the time of the deposition testimony, were understandable and the Court accepts them.

their stance at the November 25 meeting (*id.* at 47-48), it is clear he already knew "what Morgan's attorneys intend[ed] to do with this issue" (Mov. Ex. 9).

As with the LDG, the reasons for concluding that Lynch fabricated the December 1 Letter (Lynch *concedes* that he authored and signed it) does not lie with a single mistake or factual inaccuracy. Rather, it is the pattern of mistakes—hardly a single statement in the letter can be true, given the letter's purported timing. At the Sanctions Hearing, while Lynch attempted to explain away some of the document's many inconsistencies, he could not explain the major ones, such as why Miller was referenced when Miller did not know anything about the agreement or why the letter referred to Lynch receiving documents "today," when Lynch received them on November 23. Thus, given the overwhelming evidence, the Court has no other choice but to conclude that Lynch's letter is an after-the-fact fabrication.

c.     The December 28 Letter Is a Fabrication

The December 28 Letter is the third of the fabricated documents. Most important to this conclusion is the deposition testimony of James McCall, a former business colleague of Lynch's. While he recognized the signature on the bottom of the letter as looking like his, he had no recollection of writing the letter (McCall Dep. at 123-124), and did not even know the meaning of a term he purportedly used in it—"signature plate"—a term Lynch repeatedly used in his testimony at the Sanctions Hearing (*id.* at 128-130; *see also* Sanctions Hr'g Tr. at 260, 308).[18]

The timing of the December 28 Letter also helps to prove its fabricated nature. The letter

---

[18]     McCall stated in his deposition that while, in his view, Lynch was disinclined to give personal guarantees, Lynch had done so in at least one prior transaction. (McCall Dep. at 117.) McCall also acknowledged that he had not been involved in previous transactions with Lynch and was not particularly familiar with guaranty terms from prior deals. (*Id.* at 66-67.)

alleges that McCall sent signature plates on December 28—5 days *after* the completed, signed loan papers (and Guaranty) actually were mailed back to Womble Carlyle. (*E.g.*, Sanctions Hr'g Tr. at 55-57; Mov. Ex. 7.) Thus, there was no reason for McCall to send any executed "signature plates" to Karlin; the documents already had been signed and delivered. Furthermore, Karlin and Thompson made clear that the pages of a Morgan document that required a party's signature were not separated from the rest of the document, nor could they be sent separately, as the December 28 Letter reflects. (Sanctions Hr'g Tr. at 68-69; Thompson Dep. at 33-34.) In fact, Womble Carlyle apparently looked at the returned documents to see if the staples had been removed and replaced in a different location. (Sanctions Hr'g Tr. at 68-69.) There is no indication that Womble Carlyle found anything untoward in the returned documents, nor that they received the signed pages separately from the rest of the documents. Finally, Karlin was not even in Chicago, much less at work, on December 28, 1998, as the letter purportedly directed to him reflects. Karlin, who testified that he did not receive any such letter, was in Florida on vacation during this period of time. (*Id.* at 67.)

In sum, the December 28 Letter also is an after-the-fact fake. It is possible (although not clear (*see* McCall Dep. at 123, 130)), that McCall, who is not alleged to be part of any scheme to defraud the Movants or otherwise to obstruct justice, may have been duped to actually sign the document, perhaps by Lynch slipping it into a stack of papers. Nonetheless, and critically, McCall certainly did not author and send the letter and bogus "signature plates" on December 28, 1998, as the letter falsely purports to document.[19]

---

[19]     McCall may not have actually signed the document too. Whether he actually unwittingly signed it or not—he acknowledges that he signs thousands of documents, and does not recall whether he authored this one (McCall Dep. at 130-31)—is not material to the Court's ruling.

## 2. Lynch Fabricated the Documents

To rule on the Sanctions Motion, the Court must turn to step two: deciding whether Lynch is responsible for the fabrication of the documents. The Court, after reviewing all the evidence, concludes that there is only one answer, which evidence overwhelmingly establishes: Lynch is indeed responsible.

The most significant evidence in this regard is Lynch's own testimony that he generated and signed the faked December 1 Letter. Lynch's testimony about the generation of the letter has differed in some respects over time, which hardly promotes confidence in his testimony. He has never wavered, however, from the bottom-line points that he generated the document—either by typing it himself or dictating it (Sanctions Hr'g Tr. at 249, 277)—and personally signed the document (*id.* at 249). These admissions are devastating to Lynch. They are analogous to an in-court admission from a criminal defendant that he is the author of a bank robbery demand note. On the basis of these admissions alone, and the material falsehoods in the faked December 1 Letter, dismissal of Lynch's claims with prejudice likely would be warranted.

The admissions also provide considerable insight about who is responsible for the other two faked documents. First, as to the LDG, the December 1 Letter and the LDG act in tandem to point toward Lynch. The LDG is clearly fabricated, and the December 1 Letter deals with the same two issues that are implicated by the substantive alterations in pages 2 and 13 of the LDG: the bankruptcy trigger and the capacity in which Lynch signed the Guaranty. In addition, the Bates numbers for the two documents are consecutive: the December 1 Letter has Bates number GL 38765 (Mov. Ex. 9) and the LDG begins with Bates number GL 38766 (Mov. Ex. 11). As explained later, it is undisputed that Lynch had an opportunity to interject the bogus documents

34

into the universe of materials that his attorneys produced, and he above anyone else in the world had a motive to attempt to escape the consequences of the personal Guaranty that he signed.

The December 28 Letter is also tied to Lynch, since he is carbon copied on it. (Mov. Ex. 10.) Of the parties referred to in the letter—Karlin, McCall, and Lynch—Lynch is the only person who makes sense, given the overall presentation of the evidence, to be the generator of the document. McCall testified that he did not remember whether he authored it or not, and Karlin testified that had not seen it until Lynch's attorney's produced it. (*E.g.*, Sanctions Hr'g Tr. at 66-68.) The fake letter is extremely helpful to Lynch, over and above anyone else, and there has been no allegation that McCall had any reason to write the letter, especially given all the inaccuracies in it.

Several other factors implicate Lynch as responsible for the fabrication of the two documents (in addition to the December 1 Letter, which he concedes he generated and signed). First, Lynch, more than any other individual, had the *motive* to forge the documents. Of all the parties involved, Lynch clearly enjoyed the greatest benefit from the relevant documents if the fraud had succeeded. (He may have been the only person to have materially benefitted, but the Court need not reach that conclusion.) Lynch was the only person liable under the Guaranty, and thus the person with the greatest if not the only motive to attempt to doctor the record concerning the history of his signing of the Guaranty.

Lynch also had the *opportunity* to fabricate the documents and to have them interjected into the record in this case. His attorneys produced the documents, and the attorneys produced them from sources that would have easily allowed Lynch to slip the documents into the production. Sources of the documents produced by Lynch's own attorneys included, among

35

other places, Lynch's personal files and documentation taken from Lynch's garage. (*Id.* at 191; *see also* Cronin Dep. at 51, 53-54.)[20]

Third, Lynch's *behavior* is also consistent with that of a forger. After his attorneys (and only his attorneys) produced copies of the disputed documents,[21] no one else located any copies of the documents in their electronic and paper files. There were some 200 boxes of documents from Seyfarth Shaw (which were being maintained at the offices of Miller Shakman and Hamilton, its counsel) that Lynch or his agents could easily have accessed at any time. (Sanctions Hr'g Tr. at 160-163.) The Movants denied that there were any copies of the fake documents in their files. (*E.g.*, *id.* at 66, 136.) Commonsense says that Lynch, a highly educated person with considerable resources, would have attempted to clear his name by reviewing the Seyfarth Shaw files if there was any chance a helpful corroborating document would be located there. What would prove the challenged documents' authenticity more than finding a copy of them in Seyfarth Shaw's own files? But Lynch did not even attempt to look, despite ample opportunity and incentive to do so.

### 3. Lynch Is the Only Person Who Is a Logical Candidate for the Forger, Given the Rubric of Evidence in the Case

As the Court explained in its oral ruling, the Court thought hard about whether there was

---

[20]     To be sure, Lynch's counsel gathered documents from various places and from various members of the Lynch camp, including his fellow investors and entrepreneurs. And, as is often if not typically the case, Lynch's counsel did not keep a document-by-document or piece-by-piece log, like an archeologist might, of where every item of potentially relevant evidence was recovered. That is no slight on Lynch's attorneys and of no assistance to Lynch. He unquestionably had an opportunity to get the documents into his attorneys' production process, and none of Lynch's colleagues had an incentive like he did to create the faked documents.

[21]     Again, Lynch's attorneys are not accused of any misconduct.

any plausible or reasonable alternative to the conclusions the Court reached. As to the fact that the documents were fake, this was not an issue that was ever in meaningful doubt. Indeed, Lynch's counsel came close to conceding this issue in his opening statement (*id.* at 25 ), which, incidentally, substantially raised his credibility. As to Lynch being the force behind the fabrication, no other possible culprit makes any sense, as explained immediately below.

a.    Lynch's Business Partners Did Not Create the Faked Documents

Of the potential alternatives that the Court considered and rejected, one possibility for the source of the fabrications was Lynch's business partners—which, as Lynch's counsel skillfully pointed out, were also sources of documents that were produced. But Lynch admits that he generated and personally signed the fake December 1 Letter (*id.* at 249, 277)—the same letter, moreover, that appears sequentially next to the LDG in the Bates numbering for the production from the Lynch camp (Mov. Exs. 9 & 11). In addition, neither side produced any evidence that any of Lynch's business partners had material incentives to fake documents so as to absolve Lynch of the consequences of his personal Guaranty.

b.    Seyfarth Shaw Did Not Create the Documents Either

Another possibility the Court considered and rejected was that Seyfarth Shaw created at least some of the documents in the course of the actual transactions in 1998, perhaps even because Lynch somehow was telling the truth about purportedly maintaining in 1998 that he would not sign the Guaranty as it was written. (*But see* Sanctions Hr'g Tr. at 299-300 (Lynch testifying for the first time that although he never agreed to sign the Guaranty if it included the voluntary bankruptcy trigger, "we agreed as a concession, if necessary to close the J.P. Morgan loan, that the voluntary bankruptcy provision could potentially be put into the carve-out

provisions of the loan").)

This notion that Seyfarth Shaw generated the documents also makes no sense and helps to show why Lynch was perjuring himself when he offered his account of events during the McCook Properties transactions. First, again, Lynch concedes that *he* generated and signed the December 1 Letter. Seyfarth Shaw could not have generated that document—which dovetails with the bogus LDG—back in 1998. Second, the faked December 28 Letter was generated on letterhead of a Lynch-related business entity and signed, at least in Lynch's view, by his business partner. (Mov. Ex. 10.) So Seyfarth Shaw could not have created that document either.

Even as to the LDG, it would have made no sense for anyone at Seyfarth Shaw to have created a document in the format of the LDG back during the negotiation of the Guaranty. (To be clear, Karlin denied creating the LDG, said he knew of no one else at Seyfarth Shaw who created it, and stated that he never had seen any copy of the LDG in any of the extensive Seyfarth Shaw files that he reviewed. (*E.g.*, Sanctions Hr'g Tr. at 37-38, 66, 136.))[22] It would make no sense for Seyfarth Shaw to create a typed draft of the Guaranty back in 1998 in the form of the LDG, because Womble Carlyle required all changes to the Guaranty to be made by hand, on hard copies of the document printed by Womble Carlyle, and then incorporated by Womble Carlyle into a new draft maintained on its systems. (*E.g.*, *id.* at 37-38.) Even if someone at Seyfarth Shaw had wanted to propose new language concerning liability under the Guaranty, Womble Carlyle would not have wanted the proposed revisions in the form of pages 2 and 13 of the LDG. Moreover, even if someone at Seyfarth Shaw had wanted to type proposed revisions for some

---

[22]     Karlin explained that he hand-marked any proposed changes and sent them to Womble Carlyle, consistent with Womble Carlyle's practice and directions, and consistent with other documentary evidence in the case. (*See, e.g.*, Sanctions Hr'g Tr. at 38, 46; Mov. Ex. 4.)

reason, notwithstanding directions from Womble Carlyle not to do so, an attorney typing out new draft language never reasonably would have created something that looks like the bogus pages 2 and 13 of the LDG. It would be time-consuming, difficult, and pointless to have created a document proposing new language in a format that included a (botched) attempt to replicate items in the document footer such as the Womble Carlyle document control number and its client-lender's name in a special font. The only reason to emulate (imperfectly, but emulate nonetheless) the stylistic aspects of the draft Guaranty would be if one wanted to pass it off as a valid document. No one at Seyfarth Shaw had any motive to do such a thing in December of 1998. In addition, there was no record of a document matching the description of the LDG on any of Seyfarth Shaw's systems or in any of Seyfarth Shaw's files. (*Id.* at 37-38, 66, 69, 136.) The LDG also appeared sequentially adjacent to the December 1 Letter that Lynch unquestionably signed in the document production of Lynch's attorneys.

A final possibility the Court considered (and rejected) is that Seyfarth Shaw and Karlin went so far as to have created the LDG fraudulently (after the fact) and planted it on Lynch. The argument might go something like this: Seyfarth Shaw planted the LDG on Lynch, knowing he would find it and use it as evidence against Seyfarth Shaw in his third-party complaint against them. Seyfarth Shaw would then bring about a motion for sanctions to dismiss the complaint and exculpate themselves from a claim that they knew they were destined to lose. In addition to stretching the bounds of conceivable conspiracy theories, this argument is not credible for several reasons. For one, Lynch signed and created one of the challenged documents. Second, Lynch testifies that he believes all of the documents are accurate and recalls seeing them approximately when they were generated. (*Id.* at 326-28; D.E. 155, Ex. B ¶¶ 2, 10.) Lynch's own testimony

renders such an implausible theory impossible in the context of this case.

As a result, the Court concludes that Michael Lynch personally created and/or caused the creation of the fabricated documents. He personally admits to generating and signing one of them, and there is no plausible alternative to the conclusion that he is responsible for the interrelated others.

### 4. The Only Appropriate Sanction Is Dismissal with Prejudice of Lynch's Third-Party Complaint Against Seyfarth Shaw and Karlin

As a result of these findings, sanctions are appropriate. Lynch has never seriously contended, in response to the Sanctions Motion, that some sanction short of dismissal with prejudice would be appropriate. As a result, any argument about any purported disproportionality of the requested sanction of dismissal with prejudice is likely waived. *See In re Rimsat, Ltd.*, 212 F.3d 1039, 1048 (7th Cir. 2000) (collecting cases). Nonetheless, precedent instructs that a Court should consider whether some sanction short of dismissal with prejudice is fair and appropriate. Despite the waiver, the Court has given that subject serious consideration, and has concluded that the sanction of dismissal with prejudice of Lynch's third-party complaint is the only appropriate sanction in this case.

Precedent makes clear that a district court may dismiss an action with prejudice to sanction appropriately egregious misconduct by a party—whether it be in the form of flagrant disregard of discovery orders, or destruction of relevant evidence, or, as here, fraudulent fabrication of documents and perjury. *See Kovilic*, 106 F.3d at 773 ("The cases that have upheld dismissals as a sanction based on inherent powers have typically involved bad faith, fraud, or undue delay by one of the parties.") (collecting cases); *accord, e.g., Jimenez*, 321 F.3d at 657

(upholding dismissal with prejudice where plaintiff fabricated critical documents); *Pope*, 974 F.2d at 984-85 (affirming dismissal with prejudice where plaintiff offered perjured testimony and fake documents); *Quela*, 2000 WL 656681, at *7-8 (dismissing case in response to creation of false witness statements and perjury); *China Ocean Shipping (Group) Co. v. Simone Metals, Inc.*, No. 97 C 2694, 1999 WL 966443, at *4-5 (N.D. Ill. Sept. 30, 1999) (dismissing case pursuant to court's inherent authority after party failed to preserve critical piece of evidence); *Brady*, 877 F. Supp. at 453 (dismissing suit after plaintiff destroyed significant documents and committed perjury).

In making the proportionality assessment, precedent also teaches that a court must consider systemic interests in deterring flagrant misconduct by litigants generally. *See, e.g.*, *Aoude*, 892 F.2d at 1118-1119; *Quela*, 2000 WL 656681, at *8 (collecting cases); *Vargas v. Peltz*, 901 F. Supp. 1572, 1582 (S.D. Fla. 1995) (quoting *Pope v. Fed. Express Corp.*, 138 F.R.D. 675, 683 (W.D. Mo. 1990)); *Brady*, 877 F. Supp. at 453. Although the Court would find that dismissal with prejudice of Lynch's suit against Karlin and Seyfarth Shaw would be appropriate, even if systemic interests were not considered, courts consider general deterrence when imposing sanctions, and general deterrence considerations confirm the propriety of dismissal here.

Dismissal of Lynch's third-party suit is appropriate for a combination of reasons. First, the documents he fabricated are central to his case and no one seriously contends otherwise. One of Lynch's own attorneys admitted in a deposition that "I recall when I found these documents in the production, I remember saying, 'Wow. Isn't this great?'" (Cronin Dep. at 94; *accord id.* at 74.) Lynch's attorneys also, in fulfilling their Rule 11 obligations, reviewed and relied on the documents in drafting the third-party Complaint (*id.* at 90-91)—which was not filed for almost a

year after Lynch was sued on the Guaranty claim, and which was not filed until after production of the fabricated documents. The documents also naturally were used and relied upon by Lynch's attorneys when they were taking depositions in this litigation. (Sanctions Hr'g Tr. at 217-18, 230.) Lynch's case against Seyfarth Shaw and Karlin—at least the aspects of it relating to Lynch's alleged misunderstanding that he was signing a personal guaranty that might be triggered by a corporate bankruptcy—was effectively a non-starter without the fabricated documents, given all the other documentary evidence in the record. The three fabricated documents were Lynch's main if not only "objective" support for these key portions of his case.

Second, Lynch's production of the fabricated documents prejudiced his adversaries and the legal system generally. Misconduct of the sort that Lynch undertook, including his in-court perjury, was so outside the bounds of reason that dismissal would be appropriate even absent a specific showing of prejudice. *See, e.g., Barnhill v. United States*, 11 F.3d 1360, 1368 (7th Cir. 1993) (collecting cases). Nonetheless, Lynch's wilful misconduct did materially prejudice his adversaries because he corrupted the discovery record, which is of signal importance in modern civil litigation, particularly in high stakes cases like this one, which typically will settle in advance of trial. As Judge Castillo explained in *Quela*, in dismissing with prejudice a case as a sanction for misconduct:

> Our entire civil justice system is dependent on accurate and truthful discovery. Every day, litigants make settlement decisions on the basis of information obtained during the discovery process. . . . [T]he importance of accurate and truthful discovery to the civil justice system cannot be overstated.

*Quela*, 2001 WL 656681, at *7. Lynch's misconduct has imposed substantial costs and delays on Karlin and Seyfarth Shaw. Indeed, given the substantial delay between the timing of the suit

against Lynch for breach of the Guaranty and the filing of his third-party suit, it appears doubtful that the third-party suit even would have been filed (and certainly would not have been filed in the form it was, with a substantial focus on issues relating to the fake documents), had Lynch not undertaken his fraud. Likewise, Lynch's misconduct has been prejudicial to the system of civil justice generally in that it involved a fraud on the court—unlike, one perhaps might possibly conclude, a scenario in which a litigant simply wilfully and unreasonably refused on repeated occasions to comply with discovery timelines. *See Aoude*, 892 F.2d at 1118 ("A 'fraud on the court' occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by . . . unfairly hampering the presentation of the opposing party's claim or defense.") (collecting numerous cases); *accord, e.g., Kovilic*, 106 F.3d at 773; *Vargas*, 901 F. Supp. at 1579. That certainly is the case here.

Third, the Court considered the possibility of lesser sanctions—such as, perhaps, merely excluding the faked documents while allowing Karlin and Seyfarth Shaw to use them for impeachment purposes—but such a sanction would be inadequate and hollow. The Court agrees with precedent finding that when a litigant fabricates critical evidence, the interests of the judicial system militate strongly in favor of dismissal of the suit so as to deter all litigants from such misconduct in the future. *See Jimenez*, 321 F.3d at 657 (*quoting Pope*, 974 F.2d at 984); *Aoude*, 892 F.2d at 1119; *Vargas*, 901 F. Supp. at 1582 (quoting *Pope*, 138 F.R.D. at 683); *Brady*, 877 F. Supp. at 453 (quoting *Pope,* 138 F.R.D. at 683)); *Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 130 (S.D. Fla. 1987) (collecting cases). As the oft-quoted district court in *Pope* stated:

> Permitting this lawsuit to succeed would be an open invitation to abuse the judicial process. Litigants would infer they have everything to gain, and nothing to lose, if manufactured evidence merely is excluded while their lawsuit continues. Litigants must know that the courts are not open to persons who would seek justice by fraudulent means.

*Pope*, 138 F.R.D. at 683.

It *might* have been possible to argue, before Mr. Lynch elected to lie under oath, that some lesser sanction short of dismissal with prejudice should be seriously contemplated. It seemed, in fact, that Lynch's counsel were leaving this door open when they conspicuously did not cite any of the disputed documents in response to the Third-Party Defendants' summary judgment motion, and when, in response to the Sanctions Motion, they largely sought to defeat the motion by arguing that the Movants' had failed to meet their burden of proof. (*See* D.E. 133.) That changed, however, when Lynch elected to file his affidavit in connection with his surreply (in which he squarely denied fabricating the three documents (D.E. 155, Ex. B ¶ 2)), and changed even more significantly when Lynch chose to testify at the Sanctions Hearing.

The Court takes no pleasure in so concluding, but fairness to the Movants dictates that the Court must acknowledge and find that Lynch repeatedly, knowingly, and intentionally offered materially false testimony in connection with the Sanctions Hearing. At the hearing, Mr. Lynch was, with all respect, often combative and evasive, and was not credible at all. (*E.g.*, Sanctions Hr'g Tr. at 283-85, 305, 308-11.) For example, Lynch maintained, incredibly, that he was so unfamiliar with the concept of a corporate bankruptcy that it needed to be explained to him in connection with the loans and Guaranty. (*Id.* at 247, 332.) Lynch offered such sworn testimony notwithstanding that he had personally been involved in the negotiation and financing of hundreds of millions of dollars of loans relating to distressed real estate and businesses, had a

history of buying distressed properties and underperforming assets, and even had bought loan obligations and notes as part of his distressed business "much like what REP has done with J.P. Morgan here." (*Id.* at 257; *see also id.* at 330-32.)

Lynch also knowingly and intentionally offered materially false testimony when he affirmed prior affidavit testimony that the December 1 Letter, the LDG, and the December 28 Letter "were written, created, and printed on the dates they bear for the purpose of" the $30 million Morgan loan and Guaranty. (*Id.* at 325-26; *see also* D.E. 155, Ex. B (Lynch Aff.) ¶¶ 2, 10.) At the Sanctions Hearing, Lynch testified that he believed that the LDG was authentic and was written on or about its date. (Sanctions Hr'g Tr. at 326-28.) Not only were those statements lies, they were quickly exposed as lies because, among many other reasons that proved their falsity, Lynch was unable even to identify the date on the LDG that supposedly was an accurate representation of when it was created. (*Id.*)[23] In affirming the authenticity and truth of the three disputed documents, and in his testimony concerning the events leading up to the Guaranty, Lynch also materially lied about several matters such as, to take just two examples, whether he reviewed the bankruptcy terms of the Guaranty with Karlin prior to executing it (*e.g.*, *id.* at 256; *compare id.* at 46-50, 55 (Karlin Testimony) & Mov. Ex. 4 at 1-2 and Ex. 5 at 87), and whether Lynch actually signed and sent the December 1 Letter at the time it purportedly was sent (Sanctions Hr'g Tr. at 248-50; *compare id.* at 42-50, 58-61, 64-66 & Mov. Exs. 2-4).

With respect to his credibility generally, Lynch also changed his testimony in material respects about critical aspects of the Morgan transactions. For example, he testified that in 1998

---

[23]     Lynch's counsel later skillfully attempted to rehabilitate him on re-examination, but Lynch's answers on cross-examination amply demonstrated the truth.

45

he told Mr. Karlin that he would have been prepared, "if necessary to close the J.P. Morgan loan, that the voluntary bankruptcy provision could potentially be put into the carve-out provisions of the loan" for which Lynch would be liable. (Sanctions Hr'g Tr. at 299-300.) After so testifying at the Sanctions Hearing, Lynch was forced to concede that "throughout this litigation up until this morning's testimony, one of . . . [his] two positions ha[d] been that [he] did not authorize a voluntary bankruptcy trigger." (*Id.* at 300.) Lynch also testified at the Sanctions Hearing that he understood that he could face personal liability under the documents he signed (*id.* at 301), even though his position in the litigation prior to his testimony at the Sanctions Hearing was that he "did not knowingly sign any document vis-a-vis Morgan Guaranty that would implicate personal liability" as to him (*id.* at 304). Indeed, the third-party complaint that Lynch filed specifically avers that "McCook and McCook Properties would not have entered into any agreement whatsoever with Morgan had Lynch understood that the qualified and limited guaranty of an officer of McCook Properties would implicate personal liability." (D.E. 62 ¶ 9.)

In summary, Lynch's testimony at the Sanctions Hearing was not credible and was often wilfully false. Such perjury constitutes another, substantial reason for dismissing his third-party claims with prejudice. *See, e.g.*, *Oliver*, 200 F.3d at 466; *Rodriguez v. M & M/Mars*, No. 96 C 1231, 1997 WL 349989, at *2 (N.D. Ill. June 23, 1997) (dismissing case with prejudice and stating that "'[f]alse testimony in a formal proceeding is intolerable'") (quoting *ABF Freight Sys., Inc. v. NLRB*, 510 U.S. 317, 323 (1994)). The Court would have dismissed Lynch's third-party complaint with prejudice, given the document fabrication, if Lynch had not perjured himself. Nonetheless (and perhaps that is why Lynch went for broke and stonewalled under oath), Lynch's false testimony independently confirms the propriety of dismissal.

5. Final Issues Concerning the Sanctions Motion and the Dismissal

In the interest of completeness, the Court addresses several arguments that either were raised only inferentially by Lynch or that were not raised below. They are, as discussed, meritless and also in some instances waived.

First, Lynch at times has suggested that he cannot properly be sanctioned because there is no "direct evidence" that he engaged in misconduct. This argument is unsound for multiple reasons. To begin, there is direct evidence against him, at least as that term is normally used. For example, Lynch admits that he signed the fabricated December 1 Letter. And although his accounts have varied, he also admits that he either typed the letter himself (Sanctions Hr'g Tr. at 277), or dictated it himself (*id.* at 249, 276-77). Such admissions are not typically considered "circumstantial" evidence. In addition, and independently, the "direct" versus "circumstantial" evidence issue is a red herring under the law. Juries in this courthouse are routinely instructed, pursuant to the Seventh Circuit's pattern instructions, that "[t]he law makes no distinction between the weight to be given either direct or circumstantial evidence." Pattern Criminal Federal Jury Instructions for the Seventh Circuit, Instruction 1.05 (1998) (Definition of "Direct" and "Circumstantial" Evidence); *accord, e.g.*, Federal Civil Jury Instructions of the Seventh Circuit, Draft Instruction 1.12 (October 2004 Draft Proposal) (Definition of "Direct" and "Circumstantial" Evidence); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002). In assessing the evidence presented in connection with the Sanctions Motion, the Court has considered all of it, including "direct" evidence, "circumstantial" evidence, the respective witnesses' demeanor, the reasonableness of the various assertions, and so forth. Regardless of whether particular pieces of the evidence are denominated "direct" or

47

"circumstantial," the evidence makes clear that Lynch attempted to perpetrate an unconscionable fraud on the system of civil justice, his litigation adversaries, and the Court.

Second, Lynch has suggested that the Movants' presentation is somehow suspect because they did not hire an expert—presumably on word processing systems, or perhaps on handwriting. This argument also is without foundation. In effect, the Movants did present expert testimony in the form of Terry Wiley, the person in charge of administration and support (including the word processing and electronic document control systems) at Womble Carlyle. Wiley's testimony helped significantly to establish that the LDG was a fabrication and that Lynch was committing perjury. (*See, e.g.*, Wiley Dep. at 6-8, 22-33 & Mov. Ex. 12.) Wiley's testimony was more, not less, credible because he was not a paid expert. In addition, although Mr. Wiley was not technically presented as an expert via Federal Rule of Evidence 702, he clearly has an intimate familiarity with Womble Carlyle's document control systems, and he is a reasonable and qualified person to testify about them.

Moreover, the law is clear that in the absence of some atypical substantive rule prescribed by the law (none of which has been suggested here), a party only must meet its burden of proof; it need not do so through the presentation of any specific type of evidence. That is why juries in criminal cases, where the burden of proof is the highest known in the law, are routinely instructed in this courthouse that the government must meet its evidentiary burden, but it need not have undertaken a wiretap, or conducted an undercover investigation, or used aerial surveillance, and so forth. *See generally Wandick v. Chrans*, 869 F.2d 1084, 1089 (7th Cir. 1989) ("Credible testimony of one identification witness is sufficient to support a conviction."); *accord, e.g.*, *United States v. Miller*, 984 F.2d 201, 202 (7th Cir. 1993).

48

Third, Lynch does not argue that a grant of the sanctions motion would conflict with the Seventh Amendment. The Court therefore considers the issue waived. *See In re Rimsat*, 212 F.3d at 1048 (collecting cases); *accord, e.g., Jennings v. AC Hydraulic A/S*, 383 F.3d 546, 551 (7th Cir. 2004). In addition, even if the argument had been made, it would be unavailing under the caselaw. *See In re Rimsat*, 212 F.3d at 1046 (explaining that even a hearing is not required before imposition of sanctions); *see also Telectron*, 116 F.R.D. at 129 (imposing sanction of dismissal with prejudice and finding it consistent with Seventh Amendment).[24] This case involves an example of flagrant bad faith misconduct—that began with document fabrication and concluded with multiple instances of perjury and the provision of wilfully false testimony in federal court—for which precedent teaches dismissal without prejudice short of trial is appropriate. *See, e.g., Telectron*, 116 F.R.D. at 129. Any different rule would dictate that dismissal with prejudice would not be possible as a sanction in advance of trial unless the offender confessed to his or her misconduct. Lynch has not argued that such an approach is required, and the Court has not seen any authority suggesting that counter-intuitive result in the Court's own research.

Fourth, although Lynch has never made the argument formally, at times his other arguments have appeared to suggest that he believes it is improper for the Court to consider the

---

[24]     *Accord, e.g., Morgan v. Mass. Gen. Hosp.*, 901 F.2d 186, 195 (1st Cir. 1990) ("Although the district court's discretion to dismiss a complaint is circumscribed by the Due Process Clause, we cannot find that the district court abused its discretion where, as here, the appellant willfully violated procedural rules and orders of the district court. He was not, therefore, entitled to have his case heard on the merits."); *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 592 (9th Cir. 1983) ("By its terms, Rule 37 authorizes the sanction of dismissal, and a punitive dismissal is equivalent to an adjudication on the merits. That the court here chose to hold hearings to decide upon sanctions, in effect determining the merits of the case, did not violate [the sanctioned party's] jury trial right.") (internal quotation omitted).

fact that he did not look for additional copies of the fabricated documents within the files of Seyfarth Shaw, perhaps because consideration of such a failure on his part somehow reversed the burden of proof on the Sanctions Motion. Any such argument would not be well-taken. Even in the criminal law arena, where the government unquestionably maintains the burden of proof, it is settled that a prosecutor may comment on a defendant's failure to call available witnesses, or failure to attempt to rebut other evidence presented by the prosecution, so long as the government does not thereby infringe on a criminal defendant's right not to testify under the Fifth Amendment. *See United States v. Alanis*, 265 F.3d 576, 587 (7th Cir. 2001) ("The prosecution may 'ask[] the jury to assess the value of the existing evidence in light of the countermeasures that were (or were not) taken.'") (quoting *United States v. Sblendorio*, 830 F.2d 1382, 1391 (7th Cir. 1987)); *accord, e.g., United States v. Miller*, 276 F.3d 370, 374 (7th Cir. 2002); *United States v. Butler*, 71 F.3d 243, 254-55 & n.8 (7th Cir. 1995). In this case, Lynch did not have any Fifth Amendment right not to testify; he choose to testify (and perjure himself) in any event; and the failure of Lynch even to look in the Seyfarth Shaw files for additional copies of the supposedly genuine documents in no way relates to his decision to testify. As a result, the evidentiary inference one can naturally draw from his failure to look for other copies of the fake documents would be permissible, even if this were a criminal case. It is simply an example of a litigant's conduct revealing evidence about his or her beliefs or understandings, which has always been a permissible use of such evidence in the law. *See generally, e.g., United States v. Starks*, 309 F.3d 1017, 1025 (7th Cir. 2002) ("'From the very infancy of criminal litigation, juries have been permitted to consider flight as evidence of consciousness of guilt and thus guilt itself.'") (quoting *United States v. Harley*, 682 F.2d 398, 401 (2d Cir. 1982)).

Finally, lest this case become the springboard for Lynch to attempt to blame yet others for his ill-fated decisions, the Court wishes to make clear that Lynch's counsel did a superb job in connection with their representation of him concerning the Sanctions Motion. Counsel for all of the parties did a fine and professional job in connection with the Sanctions Motion and hearing, and Lynch's counsel were certainly among those who did an exemplary job. Lynch has no one to blame, in connection with the Sanctions Motion and its results, but himself. The evidence made clear that Lynch fabricated the documents, and Lynch, and Lynch alone, ultimately decided to offer his perjured and false testimony in connection with the hearing.[25]

> 6. Lynch's Third-Party Complaint Is Dismissed with Prejudice and Imposition of Related Costs and Attorney Fees

The Court does not lightly dismiss with prejudice Lynch's third-party complaint. Nonetheless, precedent teaches that, in discharging their duties, "[c]ourts should not shrink from imposing harsh sanctions where they are warranted." *Quela*, 2000 WL 656681, at \*8 (collecting cases; internal quotation omitted). Accordingly, Lynch's third-party complaint and claims against Seyfarth Shaw and Karlin are dismissed with prejudice.[26] In addition, the Court awards to Seyfarth and Karlin their attorneys fees and costs spent on the Sanctions Motion.[27]

---

[25] As stated in the Court's oral ruling, the Court would have been prepared to find Lynch engaged in the charged misconduct under any burden of proof known to the law. Lynch's counsel did an exemplary job defending him notwithstanding the difficult position in which he put them.

[26] As a consequence of this ruling, the Third-Party Defendants' motion for summary judgment is dismissed as moot.

[27] The Court considered imposing additional attorneys' fees—specifically, all fees incurred by the Third-Party Defendants related to Lynch's third-party complaint, as the Movants' requested. The Court does not exercise its discretion so as to assess *all* costs incurred by the Third-Party Defendants, including those unrelated to the Sanctions Motion. In this regard, the

51

III.  REP'S SUMMARY JUDGMENT MOTION CONCERNING THE GUARANTY

REP moved for summary judgment many months ago concerning Lynch's liability on the Guaranty. REP has consistently maintained that it believed its summary judgment motion was very strong. (The Court agrees, as explained further below.) Understandably, REP wanted an opportunity to argue that any adverse ruling against Lynch on the Sanctions Motion also should redound to REP's benefit. REP participated in the Sanctions Hearing, albeit in a subsidiary role, and made an important contribution in airing the truth in its cross-examination of Lynch.

Because the Court concludes that REP is entitled to summary judgment on the merits of its suit to enforce the Guaranty that Lynch signed, the Court largely passes on the question of whether REP independently would be entitled to a judgment based on Lynch's fraudulent and perjurious misconduct, which was largely directed against Seyfarth Shaw and Karlin. The parties have not presented meaningful authority addressing the subject of whether entry of a judgment would be a proportional sanction under such circumstances, and the Court need not venture into those waters on its own.[28] Instead, the Court rules that summary judgment on the merits of the

---

Court notes that, while he did not do so, Lynch could have filed the third-party suit even if he had not introduced the faked documents into the record. (To be sure, at least some key aspects of the suit would have been quite weak, but they still likely could have been advanced.) As a result, the Court awards only those fees incurred by Seyfarth Shaw and Karlin relating to the Sanctions Motion and Sanctions Hearing.

[28]      At a minimum, it would seem clear that REP would be entitled to reimbursement of its attorneys fees and costs expended in connection with the Sanctions Motion. The Court would be prepared to order payment of REP's fees and costs on such basis and certainly would do so if necessary. However, because the Guaranty required Lynch to reimburse the Guarantor for all reasonable costs and attorneys fees expended in connection with enforcement of the Guaranty (D.E. 121, Ex. 7 at § 1.8), REP is entitled to payment of all of its attorneys fees and costs on that basis. The sanctions proceedings have been intertwined with REP's efforts to enforce its contractual rights, and REP has participated in a professional manner throughout the sanctions proceedings. The Court also notes that REP clearly suffered prejudice as a result of Lynch's

Guaranty claim is appropriate in REP's favor.

A.      Summary Judgment Standard

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The nonmovant cannot rest on the pleadings alone, but must identify specific facts, see *Cornfield v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir. 1993), that raise more than a scintilla of evidence to show a genuine triable issue of material fact, see *Murphy v. ITT Educ. Servs., Inc.*, 176 F.3d 934, 936 (7th Cir. 1999) (citation omitted). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court views the record and all reasonable inferences drawn therefrom in the light most favorable to the nonmovant. *See* Fed. R. Civ. P. 56(c); *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The nonmovant may not rest upon the pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *See Anderson*, 477 U.S. at 248. There is no genuine issue for trial unless there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.

B.      Discussion

There are few factual disputes concerning REP's summary judgment motion. As to the facts and the law, Defendant offers three arguments in opposition to REP's motion. The

flagrant misconduct: in the absence of such conduct, REP would have had a summary judgment ruling in its favor many months ago.

arguments are respectfully rejected.[29]

1.    REP Need Not Prove Its Case "Beyond A Reasonable Doubt"

Lynch first argues that in order for REP to prevail, it must satisfy a burden "even higher

than the criminal 'beyond a reasonable doubt' burden." (D.E. 138 at 2.) This argument, with all

respect, is seriously misplaced. There are well-settled standards in the Seventh Circuit for the

adjudication of summary judgment motions. Those standards do not speak in terms of the

"beyond a reasonable doubt" standard of proof, which is a term reserved to the criminal law. In

resolving REP's summary judgment motion, the Court applies the well-settled rules for

adjudication of summary judgment requests.

2.    The Guaranty Is Not Ambiguous

Lynch maintains that the Guaranty is unenforceable because ambiguity in the document

precluded a meeting of the minds. (*Id.* at 3.) Lynch argues that the Guaranty suffers from both

---

[29]    For purposes of keeping the record clear, the Court notes that diversity jurisdiction for
Morgan's (now REP's) suit against Lynch on the Guaranty was well-grounded at its inception,
when Morgan Guaranty Trust Company of New York, a New York banking corporation with its
principal place of business in New York City, sued Michael Lynch, a citizen of Illinois. (D.E. 1.)
Plaintiff, REP MCR Realty, L.L.C., came into the case in April 2003, after it acquired Morgan's
rights and interests in the Guaranty, when Judge Gettleman granted a motion pursuant to Federal
Rule of Civil Procedure 25 substituting REP as the plaintiff. (D.E. 88.) This Court properly
maintains diversity jurisdiction over the REP/Lynch suit for two reasons. First, even if REP and
its members were not completely diverse from Lynch, precedent teaches that if diversity
jurisdiction properly lies at the time a federal lawsuit is filed, subsequent developments
concerning the residence or citizenship of the parties will not operate to divest the court of
jurisdiction. (*See* D.E. 170 at 1 (collecting cases, including *Freeport-McMoRan, Inc. v. K N
Energy, Inc.*, 498 U.S. 426, 428 (1991) (*per curiam*), and *Alvarez v. Donaldson Co., Inc.*, 213
F.3d 993, 995 (7th Cir. 2000)).) Second, as REP explained in a subsequent filing (D.E. 170),
which correctly traces out the citizenship of REP's members, REP itself is completely diverse
from Lynch. Finally, Lynch's third-party suit against Seyfarth Shaw and Karlin, which triggered
the Sanctions Motion and ruling, is properly within the jurisdiction of this Court pursuant to 28
U.S.C. § 1367.

intrinsic and extrinsic ambiguity. The Court disagrees.

a. The Guaranty Is Not Intrinsically Ambiguous

Lynch first argues that the Guaranty is "intrinsically and patently ambiguous." (*Id.*) Lynch argues that the Guaranty suffers from intrinsic ambiguity because, in his view, there are multiple potential definitions for the word "voluntary" that is used in Section 1.2 when discussing a potential "voluntary bankruptcy" trigger for the Guaranty obligations. Lynch concedes that some dictionary definitions of the word "voluntary" would appear to trigger liability for him under the Guaranty. (*Id.* at 4.) However, he argues, there is another dictionary definition—relating to acts of "'one's own free will'" (*id.* (quoting American Heritage College Dictionary (3d ed. 1993)))—by which "[a] reasonable person reviewing the Guaranty, especially one who stands to be the guarantor, would understand Section 1.2 to mean that his liability under the Guaranty is triggered by an act of his own free will to cause McCook Properties to file a voluntary bankruptcy . . . ." (*Id.* at 4-5.)

Issues of contract interpretation are usually questions of law for the Court. *See, e.g.*, *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998); *Sheehy v. Sheehy*, 702 N.E.2d 200, 204 (Ill. App. Ct. 1998) ("When a contract is unambiguous, its construction is a question of law for the court."). That is why courts often say that "[t]he interpretation of a contract is an issue particularly well-suited for resolution by summary judgment." *Baker v. America's Mortgage Servicing, Inc.*, 58 F.3d 321, 326 (7th Cir. 1995) (citing *Metalex Corp. v. Uniden Corp. of Am.*, 863 F.2d 1331, 1333 (7th Cir. 1988)).

"When interpreting a contract, a court must interpret the contract as a whole and, therefore, give meaning to the words in the context of the contract as a whole." *Winter v. Minn.*

55

*Mut. Life Ins. Co.*, 199 F.3d 399, 408 (7th Cir. 1999). To determine the meaning of a particular

term, the Court must first decide whether the term is ambiguous. *See id.* There are two kinds of

contractual ambiguity. The first is "intrinsic ambiguity," which occurs where the contract is

"reasonably and fairly susceptible to more than one meaning." *Home Ins. Co. v. Chicago and*

*Northwestern Transp. Co.,* 56 F.3d 763, 768 (7th Cir. 1995). (The second type, "extrinsic" or

"latent" ambiguity, is discussed below.) "In Illinois, an instrument is ambiguous only if the

language used is reasonably or fairly susceptible to having more than one meaning . . . ." *Bourke*,

159 F.3d at 1036 (citation, internal quotation, and internal punctuation omitted). Importantly, a

contract "is not rendered ambiguous simply because the parties do not agree on the meaning of

its terms." *Id.* (internal citation and quotation marks omitted). In addition, a word, term, or

phrase is not ambiguous just because it is not specifically defined in the contractual document.

*See Winter*, 199 F.3d at 408. When dealing with an unambiguous term, courts employ the "plain,

ordinary, and popular meaning of the term." *Id.*

The Guaranty at issue in this case is not intrinsically ambiguous. Lynch mischaracterizes

what is to be defined. Although the word "voluntary," in the abstract, perhaps has multiple

meanings, the appropriate term to be analyzed is "voluntary bankruptcy," and the phrase

"voluntary bankruptcy" in the context of this case is not reasonably susceptible to Lynch's

proposed meaning. A "voluntary bankruptcy" is a bankruptcy proceeding commenced under

Section 301 of the United States Bankruptcy Code, which provides that: "A *voluntary* case under

a chapter of this title is commenced by the filing with the bankruptcy court of a petition under

such chapter by an entity that may be a debtor under such chapter." 11 U.S.C. § 301 (2005)

(emphasis added). The historical and statutory notes expressly recognize that Section 301

"specifies the manner in which a *voluntary bankruptcy* case is commenced." *Id.*, Historical and Statutory Notes, 1978 Acts (emphasis added). In this regard, a "voluntary bankruptcy" case contrasts with an "involuntary" bankruptcy case, which is a bankruptcy initiated by creditors without consent of the debtor, in conformity with Section 303 of the Bankruptcy Code. *See* 11 U.S.C. § 303 (2005).

In addition, while Lynch cites *Black's Law Dictionary* for its generic definitions of the word "voluntary," *Black's* offers only a single definition for the phrase "voluntary bankruptcy"—namely "A bankruptcy commenced by the debtor. 11 U.S.C.A. § 301." *Black's Law Dictionary* 156 (8th ed. 2004) (under "bankruptcy"). Lynch does not offer a single instance in which a court has even suggested that the term "voluntary bankruptcy" is reasonably susceptible to more than one meaning (*i.e.*, a meaning other than the one it carries under the federal bankruptcy code), and the Court has not found any such case in its own research.

Based on the foregoing, the Court concludes that the term "voluntary bankruptcy" in the Guaranty and operative commercial documents can only reasonably be understood to mean a bankruptcy proceeding commenced by McCook Properties under Section 301 of the Bankruptcy Code. *Accord, e.g., FDIC v. Rayman*, 117 F.3d 994, 998 (7th Cir. 1997) ("In Illinois, a guaranty is a legally enforceable contract that must be construed according to its terms, so long as they are clear and unambiguous.") (collecting cases). Lynch acknowledges that McCook Properties itself filed a voluntary bankruptcy petition under the Code and that the property at issue thereafter became an asset in a voluntary bankruptcy proceeding. (D.E. 121 ¶¶ 40-41.) Under the clear and unambiguous terms of the Guaranty, Lynch's obligations were triggered, and he is liable.

In the interests of completeness, the Court notes that Lynch attempts to offer

57

evidence—in the form of his purported statements to Third-Party Defendant Edward Karlin concerning Lynch's alleged understanding of the Guaranty—in an attempt to bolster his claim of intrinsic ambiguity. This attempt is flawed on multiple, independent bases. First, precedent teaches that, "[i]f the language of the contract is facially unambiguous," as is the case here, "then the contract is interpreted by the trial court as a matter of law without the use of parol evidence." *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884 (Ill. 1999); *accord, e.g., Bourke*, 159 F.3d at 1037 ("If . . . one interpretation is reasonable and the other is not, there is no ambiguity to resolve by . . . parol evidence and there is nothing for a trier of fact to determine."). Second, Lynch's attempt to introduce his own prior statements via Karlin runs afoul of the hearsay rules. *See, e.g., Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) ("[H]earsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial . . . ."). Third, Lynch errs in suggesting that this evidence must be assessed to consider whether there was a "meeting of the minds." Where the text of a contract is clear, as is the case here, it is the text of the Guaranty, and not whatever subjective intent Lynch may purportedly have had, that determines mutual assent. Or, as Judge Rovner explained in *Ocean Atlantic Development Corp. v. Aurora Christian Schools, Inc.*, 322 F.3d 983 (7th Cir. 2003), "[w]hether the parties had a 'meeting of the minds' is determined not by their actual subjective intent, but by what they expressed to each other in their writings." *Id.* at 996 (internal quotation and citation omitted).[30]

---

[30]     The Court further notes that Lynch's proposed definition—in essence, that *he* needed to voluntarily choose of his own free will to put McCook Properties into bankruptcy so as to trigger his own personal guaranty obligations—is clearly commercially unreasonable. Lynch essentially argues that the Guaranty could not be triggered unless he chose to incur personal liability under it. (*See* D.E. 138 at 5 (Lynch contending that "[n]either Lynch, nor any reasonable person, would

b.    There Is No Extrinsic Ambiguity Concerning the Guaranty

Lynch claims the Guaranty is "extrinsically and latently ambiguous" because the

Guaranty purportedly does not address whose voluntary decision triggers Lynch's obligations

under the Guaranty. (D.E. 138 at 5; *see also id.* at 7 ("[T]he extrinsic ambiguity lies in the fact

that to anyone cognizant of the commercial setting[,] the Guaranty is incomplete.").) Lynch also

points to the aforementioned statements he related to Karlin, in which Lynch allegedly asserted

(at least at one time) that he would not sign a personal guaranty (*id.* at 6), and that he did not

believe he was signing a personal guaranty (*id.*), as purported evidence of latent ambiguity in the

Guaranty. Lynch further argues that it would be "unreasonable to conclude that the term

voluntary is meant to include the voluntary decision to file bankruptcy if made by anyone other

than Lynch." (*Id.* at 7.) In other words, this argument goes, there is no way Lynch understood

that he was signing a personal guaranty that would make him liable even if he ceased to control

the company, as occurred when he resigned all of his offices with McCook Properties and its

managing member, McCook Metals, prior to McCook Properties' filing of its voluntary

bankruptcy petition. The Court cannot agree with Lynch's assertion that there is an issue

concerning potential extrinsic ambiguity that precludes summary judgment.

"Extrinsic ambiguity" occurs where a contract is "clear on its face but someone who

knows the context of the contract would know that the contract means something other than what

it seems to mean." *Home Ins. Co.*, 56 F.3d at 768; *accord, e.g., Mathews v. Sears Pension Plan,*

---

understand the Guaranty to mean that Lynch was Guarantying that he would pay McCook
Properties obligations under the Note if the business decision to file a voluntary bankruptcy
petition rested with anyone else").) Such a "guaranty" would be largely meaningless, and
Lynch's proposed construction is not a reasonable one or one consistent with commonsense.

144 F.3d 461, 466 (7th Cir. 1998). The Seventh Circuit has noted that:

> [t]he doctrine of extrinsic ambiguity is an exception to the rule that contracts clear on their face will be enforced as written. It should be interpreted narrowly lest it swallow the rule and make written contracts mere scraps of paper. Unless the evidence sought to be introduced not only is objective but would if believed make a compelling case that the contract means other than what it seems to mean, it should be kept out.

*PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 615 (7th Cir. 1998). The Seventh Circuit has further taught that to permit admission of extrinsic evidence, "there must be either contractual language on which to hang the label of ambiguous or some yawning void . . . that cries out for an implied term." *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 608 (7th Cir. 1993).

When evaluating whether there is a triable issue concerning extrinsic ambiguity, the Seventh Circuit has repeatedly taught that subjective evidence, such as evidence that relies on the statements "of the parties themselves as to what they believe the contract means," is "inadmissible and should be disregarded." *Commonwealth Ins. Co. v. Titan Tire Corp.*, 398 F.3d 879, 885 (7th Cir. 2004) (internal quotation and citation omitted in first quote; collecting cases); *accord, e.g., Ocean Atl.*, 322 F.3d at 1004 (parties' own subjective construction of the contract will not provide grounds for stepping outside the four corners of the contract). It also bears mention that the Guaranty expressly states that

> THIS GUARANTY IS INTENDED BY GUARANTOR AND LENDER AS A FINAL AND COMPLETE EXPRESSION OF THE TERMS OF THE GUARANTY, AND NO COURSE OF DEALING BETWEEN GUARANTOR AND LENDER, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES, AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS *OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS GUARANTY AGREEMENT.*

(D.E. 121 ¶ 36 (emphasis added; capitalization in original).) This language appears not only in

the Guaranty—it is on page 13 of the final Guaranty, which Lynch acknowledges that he saw and signed. (*Id.* ¶ 20.)

The Court rejects Lynch's assertion that summary judgment is not appropriate because of a triable issue concerning extrinsic ambiguity. To begin, there is substantial doubt whether the Court should consider Lynch's proposed evidence at all because of the specific integration clause that Lynch agreed to and the fact that the language of the Guaranty, as discussed above, is clear. In *Air Safety*, the Illinois Supreme Court rejected the propriety of considering extrinsic evidence "to create an 'extrinsic ambiguity' where *both* parties *explicitly* agree that such evidence will *not* be considered" because it "ignores the express intentions of the parties and renders integration clauses null." *Air Safety*, 706 N.E.2d at 885 (emphases in original); *accord, e.g., Owens v. McDermott, Will & Emery*, 736 N.E.2d 145, 152 (Ill. App. Ct. 2000); *Baldwin Piano, Inc. v. Deutsche Wurlitzer GMBH*, No. 03 C 2105, 2004 WL 46243, at *4 n.2 (N.D. Ill. Jan. 7, 2004) (Zagel, J.) ("[T]he Illinois Supreme Court has expressly rejected resort to the 'extrinsic ambiguity' doctrine where, as here, the contract at issue has an integration clause.") (citing *Air Safety*, 706 N.E.2d at 885-86).

Even if the integration clause did not exist, Lynch still has not shown that there is a material issue concerning extrinsic ambiguity. Lynch's argument in favor of extrinsic ambiguity is largely a restatement of his argument concerning alleged intrinsic ambiguity, which the court already has rejected. In summary, Lynch offers (via a hearsay declarant) his own former statements purportedly reflecting Lynch's belief that the Guaranty was not a personal guaranty and that Lynch would not sign such a guaranty. (D.E. 138 at 6.) Seventh Circuit authority, however, repeatedly teaches that "the only extrinsic evidence that may be used to create rather

61

than to resolve a contractual ambiguity is objective evidence"—a rule specifically designed to "prevent[] a party from presenting self-serving testimony about what he meant when he agreed to the particular words in the contract." *Unelko v. Prestone Prods. Corp.*, 116 F.3d 237, 241 (7th Cir. 1997); *accord, e.g., PMC*, 151 F.3d at 614 (extrinsic evidence must be objective; "[t]hat is, it must be evidence from which an inference about the parties' intentions in making the contract can be drawn with considerably greater confidence than if the parties were merely testifying to their private understandings of what the contract meant but failed to say."). As a result, this "evidence" is not germane.

In addition, the circumstances surrounding the agreement do not suggest inconsistent interpretations of the Guaranty or create an extrinsic ambiguity question. Lynch asserts that it would be ludicrous for him to agree to a personal guaranty (relating to a transaction in which he had abundant personal financial upside potential) that might be triggered by the potential bankruptcy of one of the corporations involved in the transaction unless such a corporate bankruptcy was assured to be of Lynch's own personal choosing. To the extent Lynch offers *any* objective evidence in support of this argument (itself an open question), it is insufficient to create a triable issue concerning the meaning of the clear terms of the Guaranty.

Whatever potential liability that Lynch, an experienced entrepreneur, faced under the Guaranty was just another transaction risk (among the many risks and opportunities in the overall transaction) that would have shaped the terms of the various contracts that the parties signed. Lynch took in, or should have taken in, the various risks that the Guaranty might be triggered, including those related to any circumstance where Lynch would not personally elect to file a corporate bankruptcy for McCook Properties. If Lynch discounted that possibility (perhaps

because he owned 50% of McCook Metals LLC, which was a 99% owner of McCook Properties (D.E. 139 ¶ 9)); or, if Lynch did not consider the possibility at all; or, if Lynch now merely wants to offer his own personal statements (either directly or through a hearsay relator) that Lynch did not believe the contract said what it clearly did, he has no relief from the plain terms of the Guaranty he signed. *See, e.g., Ocean Atl.*, 322 F.3d at 996; *Abbott Labs. v. Alpha Therapeutic Corp.*, 164 F.3d 385, 387 (7th Cir. 1999). Thus, the Court follows cases like *Ocean Atlantic* in holding that any "apparent belief" of Lynch concerning the terms of the Guaranty "was flatly inconsistent" with the Guaranty itself. *Ocean Atl.*, 322 F.3d at 1005. "[B]ecause evidence of this belief does not constitute proper evidence of an extrinsic ambiguity . . . it is the language of the . . . [Guaranty] on which we rest rather than the parties' private expectations and assumptions." *Id.* As was the case in *Ocean Atlantic*, Lynch's proffered evidence "does not suggest that the terms of the [Guaranty] carried a unique, contextual meaning not apparent from the face of [the Guaranty], nor does it give . . . reason to question what the . . . [contractual documents] plainly said." *Id.* at 1004.

For the reasons stated above, the Court rejects Lynch's suggestion that there is a triable issue concerning whether he is liable under the Guaranty. REP is entitled to summary judgment on its claim.

3. REP Has Established Its Claim for Damages as a Matter of Law

REP relies on the affidavit of Richard Wilson, a Senior Asset Manager with REP's asset managing company, which explains that Lynch's total unpaid outstanding principal balance is $25,332,250.45, the unpaid interest accumulated on his obligation through March 26, 2004, is $2,475,383.07, and the unpaid late fees through March 26, 2004 is $429,295.36—for a total

obligation of $28,236,928.88. (D.E. 121, Ex. 1 at 2.) In Lynch's allegations concerning additional facts, and in his response to REP's summary judgment motion, Lynch argues that REP has not proven that it is entitled to a judgment in the amount of its claimed damages. (D.E. 138 at 8.) Specifically, Lynch alleges that REP failed to take into account amounts paid or owed under a 2002 stipulation between McCook Properties and various other parties (D.E. 139, Ex. E), including: a purported 2002 cash payment of $500,000; a payment of $2,000,000 owed in relation to the sale of McCook Metals; payments of $300,000 per month derived from an access agreement with other entities; as well as any proceeds REP received when various property related to the Guaranty was sold in early 2003, purportedly for the price of $5,500,000 (D.E. 138 at 9).

Notably, Lynch refuses to be more specific than his general allegation of deficiency on REP's part. Lynch does not mention any specific payments REP actually neglected to account for, so presumably he intends to maintain that REP failed to account for all the payments Lynch identifies as potentially relevant. Lynch also fails to offer any evidentiary support for his claim that the property at issue was actually sold for the claimed $5,500,000 (or any other actual amount). (*See id.* (failing to cite any specific evidentiary support).)

REP replies that it did account for all amounts received by JP Morgan and REP as a result of the cited stipulation and the sale of the property. (D.E. 141 at 12-13.) As a result, REP argues, it is entitled to its claimed damages.

The Court agrees with REP. First, in support of REP's statements of uncontested fact, REP attaches Mr. Wilson's affidavit, which clearly states that his calculations are for any *unpaid* principal balance, *unpaid* accumulated interest, and *unpaid* late fees. (D.E. 121, Ex. 1.) On such

64

a basis alone, the Court would find that the evidentiary record was clear, because Lynch has simply speculated, without offering any meaningful factual material in rebuttal, that Wilson's testimony somehow fails to account for other payments. *See, e.g., O'Neal v. City of Chicago*, 392 F.3d 909, 912 (7th Cir. 2004); *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004).

In addition, although the subject was not unclear within the meaning of summary judgment precedent, REP has further clarified the record and addressed any questions that Lynch raised. In the supplemental affidavit of Richard Wilson (D.E. 142, Ex. 1),[31] REP documents every payment it received after McCook Properties filed bankruptcy (*id.* at 2-4 & Exs.1-3). REP establishes that McCook Properties made ten payments by wire transfer to Morgan and REP totaling $8,406,730.20. (*Id.*, Ex. 1 at 2.) Although not material, these payments appear specifically to include a $2,000,000+ payment on May 1, 2002, pursuant to the stipulation, various monthly payments, and $4,017,730.20 generated from the sale of the property.[32] (*Id.*, Ex.

---

[31] The Court considers REP's supplement as a continued response to Lynch's apparent statements of additional fact, which he variously offered in response to REP's statements of material fact. The Court finds that it may fairly consider REP's supplement for present purposes for two reasons. First, Lynch's *ad hoc* statements of additional fact were not introduced in conformity with the Local Rules; although the Court excuses those violations and does not hold them against Lynch, fairness dictates equivalent latitude for REP, particularly given that Lynch typically offers no specific support for his factual claims and speculations. Second, Lynch, who has been ably represented in these proceedings, never moved to strike REP's supplemental affidavit of Richard Wilson (D.E. 142, Ex. 1) in the months since it was filed, so the Court considers Lynch to have waived any technical objections to it. *See, e.g., LaSalle Bus. Credit, L.L.C. v. GCR Eurodraw S.P.A.*, No. 03 C 6051, 2004 WL 1880004, at *7 n.6 (N.D. Ill. Aug. 18, 2004) (collecting authorities).

[32] To the extent Lynch argues that REP did not factor in the entire amount of the sale of the property, the argument is unavailing. First, there is no indication that REP ever received anything more from the sale of the property than the $4,017,730.20 reflected in the Supplemental Wilson Affidavit and exhibits when the monthly payments and stipulation payment are accounted

1 at 2-3 & Exs. 1-3.) Decisively, all amounts received were applied to the outstanding debt, including the amount of interest and default interest that had accrued. (*Id.* at 3.)[33] Consequently, Lynch is left with an outstanding principal balance of $25,332,250.45 (*id.*, Ex. 1 at 3), unpaid interest of $2,475,383.07 (*id.*, Ex. 1 at 4), and unpaid late fees of $429,295.36 (*id.*). This amounts to a total amount due of $28,236,928.88. (*Id.*)

Because REP has offered specific documentation concerning the amounts received and applied to Lynch's outstanding debt, and because Lynch has not offered any specific indications of payments REP failed to account for, there is no issue of material fact concerning any payments made under the stipulation or any proceeds received from the sale of McCook Properties that were applied to the outstanding debt. Therefore, REP is entitled to summary judgment in the amount of $ 28,236,928.88, as of March 2004. REP is also entitled to any accrued interest and late fees to the present, plus all reasonable attorney's fees and costs. Counsel for REP and Lynch are directed to please promptly confer to attempt to determine an agreed total damages figure

---

for. (Again, Lynch cites no factual support in his brief for his claims about the purported sale price or proceeds. (*See* D.E. 138 at 9.)) Secondly, Section 1.6 of the Guaranty waives any obligation Morgan or its assignees had to "institute or exhaust its remedies" against McCook Properties before seeking collection from Lynch under the Guaranty. (D.E. 121, Ex. 7 at 3.) The Court finds this contractual waiver enforceable (*see, e.g., FDIC v. Rayman*, 117 F.3d 994, 998 (7th Cir. 1997) ("In Illinois, a guaranty is a legally enforceable contract that must be construed according to its terms, so long as they are clear and unambiguous."); *Kolson v. Vembu*, 869 F. Supp. 1315, 1320 (N.D. Ill. 1994) (Shadur, J.) ("The rules of construction applicable to contracts generally also apply to contracts of guaranty, and if such a contract is unambiguous, it must be enforced as written.")), and Lynch does not argue that the waiver is unconscionable or otherwise unenforceable.

[33]     Wilson also explains that Lynch was given another benefit in the form of additional credits in favor of McCook Properties totaling some $426,000, which REP does not seek in return from Lynch. (*See* D.E. 142 at 3; *id.* Ex. 1 at 3.) This additional credit only serves to benefit Lynch. (*See* D.E. 142, Ex. 1 at 3.)

(reserving all objections and appellate rights, of course).

IV.  CONCLUSION

For the reasons set forth above, the Court grants the Sanctions Motion of Seyfarth Shaw and Karlin (D.E. 161). Lynch's third-party complaint (D.E. 62) is dismissed with prejudice. Seyfarth Shaw and Karlin are entitled to attorneys' fees and costs incurred in litigating the Sanctions Motion. REP's summary judgment motion (D.E. 120) is granted as well. The summary judgment motion of Seyfarth Shaw and Karlin concerning the third-party complaint (D.E. 129) is dismissed as moot.

So Ordered.

Mark Filip
United States District Judge
Northern District of Illinois

Dated: March 21, 2005